GLOUCESTER ISINGLASS AND GLUE COMPANY *vs.* RUSSIA
CEMENT COMPANY.

Essex.      November 5, 1890. — June 25, 1891.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON,
& LATHROP, JJ.

*Contract — Restraint of Trade — Public Policy — Failure of Consideration —
Specific Performance — Adequate Remedy at Law.*

An agreement between manufacturers, for the purpose of avoiding competition
and regulating prices, respecting a valuable product not of prime necessity or a
staple commodity, manufactured by both by the same process out of a nearly
worthless material of which there is a limited supply, is not void as against
public policy.

An agreement between manufacturers, an important part of the consideration of
which is a compromise of litigation respecting the infringement of a patent sup-
posed by them to be valid, which is entered into for the purpose of avoiding
competition and contains mutual covenants as to the mode of conducting their
business, will not, on a bill for specific performance of the agreement, after a
partial performance of the same and upon the patent's proving invalid, be
treated so far as it is executory as void for want of consideration, where the
parties, after discovering the invalidity of the patent, by their conduct affirm
and renew the agreement.

If the non-performance by one of the parties to an agreement between manufac-
turers, who are both engaged in producing an article from material of which the
supply is limited, will result in a continuing injury leading to difficulties in the
management of the other's business, and possibly to its destruction, by depriv-
ing him of the share of such material to which the agreement entitles him, the
latter has no adequate remedy at law, and specific performance will not be
denied him on that ground.

Specific performance of a contract, which has been varied in the execution of
its details by a common understanding and mutual consent, may be decreed
with such variation, if the rights of the parties are clear under the modified
agreement.

BILL IN EQUITY, for the specific performance of an agree-
ment between the plaintiff and the defendant.  Hearing before
*Knowlton*, J., who reported the case for the consideration of the
full court, such decree to be entered as law and equity might
require.  The facts appear in the opinion.

The case was argued at the bar in November, 1890, and af-
terwards, in June, 1891, was submitted on the briefs to all the
judges, except *Barker*, J.

*C. Browne*, for the plaintiff.

*P. E. Tucker & C. H. Drew*, for the defendant.

KNOWLTON, J. The plaintiff and the defendant corporations, which had been engaged in litigation with each other as to the alleged infringement of a patent owned by the plaintiff, supposing the validity of the patent fully established, and believing that they would be able practically to control the profitable manufacture of fish glue, entered into a contract with each other by which the defendant was to pay a certain sum for damages, and one half of the costs of the suits, and was to be allowed the use of the patent. Each party was to conduct its own establishment, and they were to unite in the purchase of fish skins, an article of which the supply was limited and from which the fish glue is manufactured, so that there should be no competition between them. The plaintiff was to fix the price of all skins purchased, and the parties were to have certain places assigned to them by two persons named, of which they were respectively to have the product. From the proprietors of certain other places mentioned the defendant was to have the entire product, and to allow the plaintiff to receive from it one third thereof, and the two parties were to divide equally between them the skins which might be obtained from new producers. They were both to sell the glue at the same price, to be agreed upon from time to time, and the contract contained other stipulations the effect of which was to prevent competition between them. The contract was made in February, 1884. After they had conducted the business in this manner until early in 1887, it became evident to both that the patent was invalid, although no formal judgment was rendered declaring it so. Thereupon, Brooks, the manager of the defendant company, made a large number of what are known as the long term contracts, for the purchase of all skins to be produced until the year 1900, with nearly all the producers of fish skins known to the parties. The plaintiff received its share of these skins, and no difficulty arose between the two companies until early in July, 1890, when the defendant notified the producers of skins by whom the plaintiff had been supplied up to that time not to deliver it any more skins, and also notified the plaintiff of its abandonment of the contract. Until then the parties had gone along under the contract as modified by mutual

consent, and no intimation had been given the plaintiff of any intention to abandon it. The object of the bill is to compel the defendant to permit the plaintiff to obtain directly from the producers, or through the defendant, what it deems its share of the fish skins. The defendant rests its defence on several grounds. It contends that the contract as originally made was void as contrary to public policy; that it cannot be enforced, because, the patent being invalid, there was no sufficient consideration for it; that, if it is binding, the plaintiff has a complete and adequate remedy at law; that, if the plaintiff is entitled to any relief at all, it should be compelled to take its proportion of the waste received by the defendant under the long term contracts with third parties; and finally, that, if the plaintiff had a right to specific performance of the contract, it has lost it, by reason of its own conduct, and the conduct of the defendant to which it has assented since the original contract was made.

The original purpose of the contract was to regulate the business of manufacturing a product under what was supposed to be a new invention, on which letters patent of the United States had been issued, whereby an article then nearly worthless might be converted into an article of large value. The use to which the fish skins were put under this invention gave them their market value. The plaintiff and the defendant sought to unite with each other in the purchase of the raw material, so that they might not be tempted to overbid each other and thus to raise it to an unreasonable price, and also to agree on the price at which the manufactured article should be sold, so that they might be secure in a reasonable profit. Even if they hoped for gain by their joint exertions, or by the possession of a patent as to the value of which they were subsequently disappointed, their contract had no relation to an article of prime necessity, or to staple commodities ordinarily bought and sold in the market, but to a particular article, of which both were manufacturers under the same process, and to an article used in the manufacture which was of little value for any other use. That the agreement was not obnoxious to the objection made by the defendant is shown by the case of *Central Shade Roller Co.* v. *Cushman*, 143 Mass. 353.

The next inquiry is whether the contract is incapable of en-

forcement for want of consideration.   If there were no consideration for it but a transfer of an interest in a void patent, it would be invalid.   *Nash* v. *Lull*, 102 Mass. 60.   *Harlow* v. *Putnam*, 124 Mass. 553.   The parties had been engaged in extended litigation involving several suits.   As between them and for that litigation the validity of the patent had been established by a decision of the Circuit Court of the United States ; and a judgment for damages in favor of the plaintiff against the defendant was about to be rendered.   An important part of the consideration of the contract was a compromise and adjustment of the controversy which had taken form in the suits then pending, and a liquidation of the damages which the plaintiff was about to recover under the decision of the court.   Moreover, the parties were competitors in business, and for mutual advantage they entered into mutual covenants as to the mode of conducting their business, and the covenants of each in that particular were a consideration for the covenants of the other.   Before the invalidity of the patent was discovered, they had performed the contract in part, and what each had done in the management of its business was a part of the consideration for what remained to be done by the other.   The belief that the patent was valid was one of the causes of making their agreement, but it was not the consideration of it in any sense in which it can be separated from the other objects and promises which formed a part of the consideration.   Both parties are disappointed in regard to a fact upon which they supposed they could rely, but the contract cannot therefore be avoided, so far as it is executory, when so many other elements entered into it, and when the parties have for a long time been deriving advantage from it, not only in their dealings with each other, but with the public.

If it should be held that the right to use the patent formed so large a part of the consideration for the defendant's undertaking that, after the discovery of the mistake of the parties in this particular, a court of equity would decline to decree specific performance against the defendant if it had seasonably sought to avoid the contract on the ground of mistake, there are reasons why such a defence should not avail the defendant in this case.   After both parties knew that the patent was void, the defendant still chose to avail itself of the benefits of the contract,

and to go on under it.  There had been no adjudication that the patent was invalid, and the existence of the patent and of the arrangement under which the plaintiff and the defendant were acting was probably somewhat advantageous to the parties long after they discovered that the patent would not protect them if put to the test of litigation.  The report finds that "both parties attempted in good faith to do what the contract called for, and no complaint has ever been made of a breach of any of its provisions by either of them until July, 1890, a few days before the commencement of this suit."  In making the long term contracts, Brooks, the defendant's treasurer and manager, acted without the knowledge of the other officers of either of the corporations, in order that he might make the contracts quickly; but it must be inferred that he intended that the plaintiff should have the benefit of them as well as the defendant, so far as might be necessary to carry out in substance the provisions of the contract existing between them.  This is apparent from the fact that before buying the skins of the firms of Shute and Merchant, John Pew and Son, and Cunningham and Thompson, he executed another agreement in the name of the defendant corporation, which was professedly a contract for the protection of the plaintiff in regard to the right to purchase skins after the expiration of the agreement between the plaintiff and the defendant, and until the year 1900.  Perkins, who was president of the plaintiff corporation, and who controlled the sale of the skins and waste of the above mentioned firms, would not consent to a sale of the skins unless the defendant would sign a contract for the protection of the plaintiff after the expiration of the agreement, and it was assumed by both parties that the plaintiff would have the benefit of these purchases, and would need no protection during the continuance of the original agreement.  The report recites: "The action of Brooks in buying the skins was afterwards approved and ratified by the officers of both corporations, and the plaintiff has received skins purchased under some of these contracts, and paid for them at the rate of twenty dollars per ton until July, 1890."  The action so ratified and approved must be deemed to have been for the benefit of both corporations, at least until the expiration of their original contract.  The conduct of the parties was, in effect, an affirmance and renewal of

the contract after the invalidity of the patent was well known. It would be most inequitable to permit the defendant — after having induced the 'officers of the plaintiff to consent to its purchase of nearly all the skins which would be likely to come into the market for a long term of years, on the faith of an understanding that the plaintiff was to share in the benefits of the purchase — to repudiate the contract, and leave the plaintiff without the means of procuring skins to carry on its business. We are of opinion that, if the defendant might successfully have defended against a suit for specific performance on the ground of the invalidity of the patent if it had sought to repudiate the contract on the discovery of the mistake, it has so far affirmed the contract since that it cannot do so now.

The next objection of the defendant is, that, even if it violates its contract, it is not shown that the plaintiff has not an adequate remedy at law. The only remedy which the plaintiff could have at law would be by a recovery of damages for the failure of the defendant to deliver, or to allow those to deliver with whom it had made contracts in its own name but for the benefit of both, the due proportion of fish skins to the plaintiff. It sufficiently appears that the principal market for them is in Gloucester, that most of the skin producers there are under contract with the defendant, and that fish skins are of very limited production. "If the plaintiff is unable to obtain skins produced by firms which have contracted with the defendant," it is found that "it will be very difficult, if not impossible, for it to carry on its business." This continuing injury, leading to difficulties in the management of the plaintiff's business, and possibly to its utter destruction, is one that could not be measured in damages. It would be practically impossible to estimate the amount of the injury, or to repair it. The plaintiff's property invested in the manufacture must lose a considerable, but uncertain, amount of its value. The injury thus threatened would be practically irreparable. *Florence Sewing Machine Co.* v. *Grover & Baker Sewing Machine Co.* 110 Mass. 1, 11.

It is urged that, if the plaintiff is entitled to any relief at all, it should be compelled to take its proportion of the waste as well as of the skins, including in the computation the waste and skins of George Perkins and Son. In addition to the fish skins,

which were the most valuable product for the manufacture of glue which is left in the business of cutting and packing salt fish, there remain fins, bones, tails, etc., which go by the technical name of waste. A fish glue of an inferior character is made therefrom. As to certain firms, including George Perkins and Son, with whom the long term contracts for fish skins were made by Brooks, it appears that they would not sell the skins unless the defendant would agree to buy the waste also, and pay a fixed price therefor. While the contracts made by Brooks were ratified so far as the purchase of skins was concerned, the plaintiff has neither recognized nor been required to recognize them so far as waste is concerned. The plaintiff does not use waste, nor has it been requested by the defendant to take it. The defendant has manufactured this itself, and it does not appear that such manufacture is unprofitable. The business was thus conducted, and the plaintiff received its allotted portion of skins, from 1887 until July, 1890, when the defendant announced that it should retain all the skins for which it had made contracts. While there had been no formal fixing of prices at which the skins should be bought, this had been substantially arranged between the parties without disagreement, but it nowhere appears that the waste was at any time made the subject of negotiations. In regard to the mode of delivery of the skins, it had been arranged that the plaintiff should receive, as its fair proportion, those contracted for with Tarr and Brother and with Wanson and Company, paying the producers therefor, the charge being made directly to the plaintiff. It was also arranged that the establishment of Shute and Merchant should be allotted to the plaintiff, the charge for the skins produced there being made to the defendant, and the payment being made by the plaintiff to the defendant, and by it to Shute and Merchant. Nowhere was there a suggestion that the plaintiff should pay for waste, although there was a provision for the sale of it in the contract with Shute and Merchant. We are of opinion that the defendant cannot compel the plaintiff to take any portion of the waste. The conduct of the parties is quite conclusive that there was no bargain between them as to this.

The defendant further contends, that, if the plaintiff had a right to have the contract specifically enforced, it has lost it by

its own conduct since the contract was made. It is found that both parties have attempted in good faith to do what the contract called for. The licenses granted by the plaintiff to other parties to manufacture under the patent were assented to by the defendant, two of them by giving certificates under seal, and one orally, by its president and general manager, acting in its behalf. The purchase by the plaintiff at one time of four or five tons of extra fish skins in a neighboring State, at a price a little higher than they were paying at home, did not injure the defendant, and it is not contended in argument that the contract can be avoided for that reason. But in some other particulars the parties have not literally followed the terms of the contract, but by a common understanding and mutual consent have modified the execution of it in details. It sometimes happens that, by such variations from an agreement, the parties leave their rights so uncertain that specific performance of the contract cannot be decreed. But if, after changes are assented to, it is still clear what the rights of the parties are under the contract as modified, there is nothing to prevent the enforcement of those rights by a decree for specific performance. Even if the agreement were wholly oral, it might be specifically enforced. *Somerby* v. *Buntin*, 118 Mass. 279, 287. Whatever uncertainties and difficulties might arise if the plaintiff sought literally to enforce the original provisions of the contract, the parties have by their acts so applied the contract to the new conditions which they have created, as to make it clear that the plaintiff is entitled to have the skins purchased of Tarr and Brother, Wanson and Company, and Shute and Merchant, under the contract as interpreted, modified, and applied by the parties by mutual consent and for their common benefit. Of course third parties who have made contracts with the defendant cannot be compelled to act otherwise than in conformity with their agreements. But the relief to which the plaintiff is entitled, and all that it asks for, will be obtained by an order that the defendant deliver to the plaintiff on demand the fish skins received from the three firms named, on payment to it of what the skins cost the defendant, so long as these shall not exceed the proportion which the plaintiff is entitled to receive.

*Decree accordingly.*