# CHARLESTON.

ELK REFINING CO. v. FALLING ROCK CANNEL COAL CO.

Submitted November 21, 1922.    Decided December 5, 1922.

1. SALE—*Where Ambiguous Practical Interpretation by Parties May be Looked to, to Determine Meaning.*

   Defendant Coal Company, the owner of about 3,000 acres of land from which it was producing large quantities of oil and gas, in order to facilitate the profitable marketing of its oil and gas, on May 21, 1913, entered into a written contract with Logan and Bannerot, whose rights thereunder by its terms were to be and were assigned to plaintiff Refining Company. Among other things, the contract provided that the Refining Company should within three months from its date erect an oil refinery on lands of the Coal Company, leased to it under a separate instrument, of a capacity of at least 10,000 barrels of oil per month; that the Coal Company would sell and deliver to it, of its own production, should it produce it, 10,000 barrels of oil monthly for ten years from the date of completion of the refinery, and should it not produce that much monthly, then it would sell and deliver all it produced. The Refining Company agreed to accept and pay therefor at 35 cents per barrel in excess of the market price for Pennsylvania crude. It was also agreed that should the Coal Company be unable to furnish 10,000 barrels monthly, then the Refining Company might purchase elsewhere sufficient oil, which, with the quantity furnished by the Coal Company, would make 10,000 barrels per month.

   The Coal Company also agreed to sell and the Refining Company agreed to buy all the natural gas that it might need for lights, fuel, or other purposes for which gas might be used in connection with the operation of its refinery, and to

pay therefore 5 cents per thousand feet, plus the production tax, if any. With respect to the quantity of natural gas that the Refining Company may require the Coal Company to' furnish, the contract is ambiguous, and we may look to the practical interpretation thereof by the parties to determine its meaning.   (p. 485).

2.   SAME—*Contract Construed as to Quantity.*

The Refining Company, with the knowledge and acquies-. cence of the Coal Company, from time to time, at great expense, enlarged its plant and increased its capacity to more than three times that required by the contract; the Coal Company during this period, covering a number of years, continued to furnish natural gas at the contract rate for refining plaintiff's oil largely in excess of 10,000 barrels per month, though the Coal Company's production declined to about 500 barrels per month, and the Refining Company purchased the excess elsewhere.   Under the circumstances shown, the court will adopt the practical construction placed upon the contract by the parties, and the Coal Company is required to furnish, during the life of the contract, sufficient natural gas to operate the Refining Company's plant, at its present increased capacity, though that exceeds 10,000 barrels of oil per month. (p. 485).

3.   SPECIFIC PERFORMANCE—*Remedy in Court of Law to Exclude Jurisdiction of Court of Equity for Specific Performance Must be Plain, Adequate, and Complete.*

A remedy in a court of law to exclude the jurisdiction of a court of equity of a suit for specific performance must be plain and adequate, and as certain, prompt, complete and efficient to attain the ends of justice and its prompt administration as the remedy in equity.   (p. 485).

4.   INJUNCTION—*Equity Will Enjoin One Under Contract to Supply Gas to Refining Company Upon Showing of Necessity and Compliance With Contract.*

On a showing by plaintiff Refining Company that natural gas is necessary to enable it to carry on its refining business and that it can not obtain the necessary, steady and certain supply from any source other than from the Coal Company, and that the Coal Company has such supply at hand in pipes already connected to plaintiff's refinery and now being used by plaintiff; that the Coal Company has threatened to stop delivery of gas in excess of the amount estimated to be suffi- cient to refine 10,000 barrels of oil per month and that when

that amount is refined in any one month then to cut off plaintiff's supply for the remainder of that month, equity will enjoin defendant from curtailing plaintiff's supply of natural gas necessary to operate its refinery in its present increased capacity, so long as the Refining Company complies with the terms of the contract. (p. 485).

5. SPECIFIC PERFORMANCE—*Equity Not Prevented From Granting Aid Because of Mere Lack of Mutuality of Remedy.*

If specific performance be otherwise proper, equity is not prevented from granting its aid because of mere lack of mutuality of remedy. It is sufficient that defendant's compulsory performance is conditional upon plaintiff's continued readiness to perform its obligations. (p. 485).

Appeal from Circuit Court, Kanawha County.

Suit by the Elk Refining Company against the Falling Rock Cannel Coal Company. From decree for defendant, the plaintiff appeals.

*Reversed; Decree for plaintiff.*

*Wilson & Evans, Blue & McCabe* and *Harry V. Campbell,* for appellant.

*Koontz & Hurlbutt,* for appellee.

MEREDITH, JUDGE:

Plaintiff, Elk Refining Company, appeals from two decrees of the Circuit Court of Kanawha County, sustaining demurrers to its original and supplemental bills of complaint and dissolving and refusing to reinstate and make permanent a temporary injunction theretofore granted.

As shown by the pleadings, plaintiff is and has been since 1913 the owner and operator of a plant for the refining of petroleum and petroleum products. This refinery is located on lands formerly leased from the defendant Coal Company but now owned by plaintiff. Defendant Company is the owner of 3,000 acres of oil and gas lands in Big Sandy District, and is producing large quantities of oil and gas therefrom. On May 21, 1913, defendant, in order to facilitate the profitable marketing of its oil and gas, entered into a contract with H. A. Logan and Fred G. Bannerot, by the terms

of which defendant agreed to sell to Logan and Bannerot and they agreed to buy, for a period of ten years, 10,000 barrels of crude oil each month, provided defendant should produce that amount, and Logan. and Bannerot on their part agreed to erect and operate on lands leased to them under the contract an oil refinery of the capacity of at least 10,000 barrels per month. Defendant further agreed to furnish the gas necessary to be used in connection with the refinery at the price of five cents per thousand feet. As was contemplated under other provisions of the contract, the plaintiff corporation was subsequently organized and the rights and obligations of Logan and Bannerot under the contract were, with the assent of defendant, assigned to it.

Plaintiff erected the refining plant; enlarged and extended it from time to time until its capacity greatly exceeded 10,000 barrels per month; refined, as was agreed, and at the price agreed, all the crude oil furnished by defendant; and bought the gas supplied by the defendant for the operation of the refinery at the stated price of five cents per thousand feet. There was no apparent objection on the part of either party to the acts of the other in carrying out the contract until March 25, 1922, when the secretary of the defendant company notified the plaintiff by letter that in the future, in fact for that month, plaintiff could expect but 10,000,000 feet of gas per month, "in order to comply with the contract." Plaintiff, maintaining that under the contract it was entitled to all the gas it required to operate its refinery, provided defendant had it to furnish, instituted this suit, praying in its bills of complaint that defendant be restrained from limiting its supply of gas to 10,000,000 feet per month, and from shutting off the supply as was threatened in defendant's letter, and further, that defendant be expressly required to furnish all necessary gas in accordance with the terms of the contract. As heretofore stated, plaintiff secured a temporary injunction, which however was dissolved when the demurrer to the original bill was sustained, and which was denied reinstatement when a demurrer to the supplemental and amended bill was also sustained.

Although elaborated in the briefs, there are but two issues

presented: First, Has equity jurisdiction to afford the relief asked? and, Second, Under the contract of May 21, 1913, is defendant required to furnish all the gas necessary for the operation of plaintiff's plant, or, may it limit this supply to the amount required for the refining of 10,000 barrels per month; it being expressly stipulated in the contract that in case defendant becomes unable to furnish that amount of oil, the buyers (that is to say, the plaintiff) could supplement the supply from outside sources? Should the first query be answered in the negative, it would· of course be unnecessary to consider the second.

First. Has equity jurisdiction to grant the injunction? Plaintiff confidently asserts that it has; defendant with equal assurance says it has not. This is an injunction to restrain the alleged breach of a contract, a proceeding which Pomeroy terms (Equity Jurisprudence, 2d ed. Sec. 1341) "A negative specific enforcement of that contract." Analyzing the court's jurisdiction in treating of such proceedings, the same author continues: "The jurisdiction of equity to grant such injunction is substantially coincident with its jurisdiction to compel a specific performance." Since in this case, the prayer is for mandatory relief as well, plaintiff both impliedly and directly subjects itself to the rules of equity governing specific performance. "The universal test of the jurisdiction, admitted alike by the courts of England and of the United States, is the inadequacy of the legal remedy of damages in the class of contracts to which the particular instance belongs." Pomeroy, *supra.* The application of this universal test is the chief source of difference between counsel here. Counsel for plaintiff aver the inadequacy of the relief at law, citing cases to support their position. Counsel for defendant take the opposite view, and rely upon two cases decided by this court.

In the first of these, *United Fuel Gas Co.* v. *West Virginia Paving Co.,* 74 W. Va. 484, 82 S. E. 329, plaintiff, a public service corporation, contracted to sell, and defendant, a manufacturer, agreed to purchase, gas at a stated price for a period of three years. During the term provided, defendant ceased using plaintiff's gas, and purchased from

another company. Plaintiff instituted suit for specific performance and the court, in denying the relief prayed for, held that the plaintiff's right of action at law for damages was "adequate and complete." In the other, *Warren* v. *Coal Company,* 85 W. Va. 684, 102 S. E. 672, plaintiff, the buyer, and one of the defendants, the seller, entered into a coal sales contract, for the sale and delivery of coal during a stated period. The seller became involved financially and did not deliver the coal as agreed. The suit was instituted against the seller and its alienee to compel performance, which relief was denied by this court. These cases, the defendant argues, are in point with the case at bar. We cannot agree with the application. To use the language of the case first cited, the contracts in both cases were "for the sale of a common article of commerce at a fixed price," and, as stated, there was in neither case any good reason why the plaintiff could not obtain complete compensation in damages. These cases were governed by the well settled principle that equity will not, in general, decree the specific performance of contracts concerning personal property, its value being ascertainable at law. There are instances, however, where because of some special or peculiar value of the subject matter, equity will assume control. We agree with counsel for plaintiff that the present case is such an instance. In the first place, the bill shows that the plaintiff invested $300,000 in a refining plant, so constructed as to be dependent upon gas for fuel; that it has purchased tank cars of considerable value; that it has contracted for extensive purchases of crude oil, in fact, for deliveries of 7500 barrels per week; that it has installed an elaborate fire protection system requiring gas for its operation; that, assuming plaintiff's construction of the contract to be correct, the defendant agreed to supply this gas from its wells located in the vicinity of the plaintiff's plant; and that defendant now has an abundance of gas available for that purpose. But, says the defendant in argument, natural gas in West Virginia is a common article of commerce, available on the open market, and if defendant chooses to shut off its supply, contrary to its agreement, plaintiff's recourse must be in a court of law for damages. This con-

tention is, we think, contrary to the facts averred in the bill and admitted on demurrer. If procurable at all, it is shown that any gas available to the plaintiff must be secured from the United Fuel Gas Company, a public service company, whose rate is triple that fixed by plaintiff's contract with defendant, and whose first duty in times of curtailed supply is to serve domestic consumers, if necessary shutting off the supply to industrial consumers. Contrary to defendant's contention in its brief, it is not a matter of the court's common knowledge that such shortages have not occurred. Plaintiff's plant requires a constant and unfailing fuel supply for its processes. Defendant's wells are in close proximity to the refinery, a circumstance tending to insure a steady supply and to minimize the dangers of breaks and leaks in the lines. For these and other reasons, we consider that defendant's gas supply is of a peculiar value to plaintiff, and that it can not be readily replaced on the market. Believing this to be true, in accord with prior decisions of this court in regard to contracts involving shares of stock of uncertain value, *Morgan* v. *Bartlett*, 75 W. Va. 293, 83 S. E. 1001; *Hubbard* v. *George*, 81 W. Va. 538, and other cases of this and other states, we conclude that, so far as the subject matter of this contract is concerned, equity may properly grant the relief asked. A remedy in a court of law to exclude the jurisdiction of a court of equity of a suit for specific performance must be plain and adequate, and as certain, prompt, complete and efficient to attain the ends of justice and its prompt administration as the remedy in equity.

While defendant relies mainly on its contention that plaintiff has an adequate legal remedy, yet it also contends that there is lack of mutuality in the remedy. In other words, suppose that plaintiff refuses to purchase defendant's oil to the amount of 10,000 barrels per month, on being proffered that amount, and a sufficient quantity of gas necessary to refine it, could the defendant, in equity, compel plaintiff to accept its oil and gas and pay for it? Plaintiff has the ability to do it; its plant is fully equipped to take care of the oil and to use the gas. But suppose it capriciously refuses to carry out its contract with defendant and procures its supply

of oil and gas elsewhere; under such circumstances, can defendant obtain relief in a court of equity? This, when applied to the facts in the case, is what we understand by the expression mutuality of remedy. No question is raised as to mutuality of obligation. That is conceded.

A case similar to this in many respects is *Great Lakes & St. Lawrence Transp. Co.* v. *Scranton Coal Co.*, 152 C. C. A. 437. There the coal company, a large shipper of coal, entered into a contract with defendant Transportation Company, a ship owner, which provided that during three seasons plaintiff would employ certain of defendant's steamers to carry its coal westward from Oswego at stated rates of freight. It agreed to load all of such vessels on their west-bound trips, subject to exception in case of strikes, etc., while defendant agreed to carry the coal on all west-bound trips of its steamers, subject to like exceptions, or in case of loss of a vessel. The Transportation Company threatened to sell the vessels for use in European waters during the recent war. It was shown that the coal company could not obtain other vessels of a suitable size to carry its coal and deliver it at its terminals. Defendant there urged lack of mutuality, but the court held that "If specific performance be otherwise proper, equity is not deterred from granting its aid because of a so-called lack of mutuality in the remedy; but it suffices that defendant's compulsory performance is conditional upon complainant's continued readiness to carry out its obligations." See also *Equitable Gas Light Co.* v. *Baltimore Coal Tar & Mfg. Co.*, 63 Md. 285; *Gloucester Isinglass & Glue Co.* v. *Russia Cement Co.*, 154 Mass. 92, 26 A. S. R. 214, 27 N. E. 1005; *Texas Co.* v. *Central Fuel Oil Co.*, 194 Fed. 1, 114 C. C. A. 21; *Hall* v. *Philadelphia Co.*, 72 W. Va. 574, 78 S. E. 755. In the present case the plaintiff stands ready, willing and able to comply with its part of the contract. It has not heretofore made default. The court, in granting the relief asked, can grant it upon terms, that is, it can require defendant to perform its part so long as plaintiff does the like. So long as plaintiff performs its part, there will be no occasion for defendant to resort to a court, either of law or equity for any relief. Defendant can not therefore interpose

a lack of mutuality as a defense. As to the necessity of supervision of the gas production by the court, it has not been shown, nor do we think it can be shown, that any additional supervision or management will be required. Defendant admits its obligation to furnish 10,000,000 feet of gas per month and does not refuse to furnish that amount. Certainly it will have to continue its operation of the field in order to do so. Little or no additional labor or skill is required to produce the extra gas demanded by plaintiff.

. Our conclusion, therefore, is that equity has jurisdiction to award the injunction sought.

Is plaintiff entitled to all the gas necessary for the operation of its plant, or may defendant limit the supply to 10,000,000 feet per month, the maximum amount estimated by it as necessary to the refining of 10,000 barrels of oil per month? Both parties base their claims on their interpretations of the contract of May 21, 1913. We must therefore review it and the circumstances giving rise to it in some detail. It will be recalled that defendant owned 3000 acres of oil and gas lands, and desired an advantageous market for its output. This market the plaintiff supplied when the refining plant was erected. By means of it, defendant received 35 cents more per barrel for its oil than the open market price for Pennsylvania crude, and if the allegation of the bill be true, a higher price for the gas contracted to plaintiff than could be obtained on the market at the time. The contract is of some length, and we will quote only the portions directly pertinent to this inquiry. First, the "Buyers agree to erect upon the seller's aforesaid land all the necessary buildings, tanks, stills and other structures necessary for the refining of crude oil and of sufficient capacity to refine *at least* Ten Thousand (10,000) barrels of crude oil per month after the said works are completed and in full operation." The above language confers a broad obligation upon the builders of the refinery, to-wit, they shall build a refinery of the capacity of at least 10,000 barrels monthly. Plaintiff relies strongly on this paragraph.

The second paragraph deals with the lease of the building site by defendant, but since the plaintiff subsequently pur-

chased the land, the lease is not involved in this controversy.

Paragraph three contains the provisions as to the sale of the oil, the buyers agreeing to buy all the oil produced by defendant up to 10,000 barrels monthly, it being agreed that there was no obligation on defendant to furnish that· amount unless its production exceeded or equalled it. A subsequent paragraph, No. 7, provided that in case defendant became unable to furnish the full 10,000 barrels, the buyer should have the right to buy from others the amount necessary to make up that quantity.

Paragraph five makes provision for the sale of gas by defendant for the operation of the refinery. From it we quote: *"The seller agrees to sell and the buyers agree to buy all the natural gas that they may need for lights, fuel or other purposes for which gas may be used in connection with the operation of said refinery,* which gas is to be delivered by the seller in a pipe line or pipe lines at the buyers' works, and the seller shall furnish, install, and maintain a meter or meters at the buyers' works for measuring such gas supplied the buyers and said meter or meters shall be tested whenever required by the buyers or seller and kept in accurate condition.'' The price was fixed at five cents per thousand cubic feet.

The provisions quoted and referred to are the bases of the claims of the parties. It is the theory of the plaintiff that since the only stipulation in the contract as to the size of the plant is the requirement that it be of sufficient capacity to refine *at least* 10,000 barrels of crude oil monthly, it is therefore not limited to a plant of that size, and that whatever the size of the plant, defendant, under paragraph five of the contract, is bound, so far as its production allows, to furnish the gas required for its operation. Defendant, on the other hand, maintains that insofar as any obligation of defendant to furnish gas is concerned, the contract contemplates a refinery of not more than 10,000 barrels capacity.

Had we been called upon to interpret this contract at the outset, before the parties thereto had made any performance in pursuance thereof, or before any circumstances had arisen to make of it a working contract in operation, we confess

that the ambiguity which gives rise to the present diversity of construction would be a matter of somewhat difficult solution. Happily, however, in the present instance, we are guided by a high authority, that is to say, the construction put upon the instrument by the parties themselves. They, if any one, knew their own intent, and it is the intent of the parties which is the object sought in construing either written or oral contracts. See in this connection *Weterwald* v. *Woodall,* 83 W. Va. 647, 98 S. E. 890.

Beginning with the month of February, 1914, defendant delivered gas and oil under the contract in varying quantities up to the time of the institution of this suit. Plaintiff's consumption of oil during the period varied also. In February, 1914, it refined 3335 barrels of crude oil. By steady increases, its production mounted, until in August, 1915, its minimum stipulated capacity of 10,000 barrels was exceeded by 42 barrels, and in January, 1921, it reached its highest activity, refining 32,773 barrels. During the period between August, 1915, and March, 1922, the amount of oil used at no time fell below 10,042 barrels per month, and averaged 21,105 barrels. Of this oil the defendant at first contributed a considerable quantity, but its production fell off until at the time of the institution of this suit it was able to furnish not more than 500 barrels monthly.

The amounts of gas furnished by defendant during the same period varied correspondingly, though the fluctuations in the amount of gas consumed each month are by no means uniform with the variations in the quantities of crude oil refined. This probably is in part due to refining by plaintiff of some of the lower grades of oil purchased elsewhere. Just what relation the amount of gas burned bears to the quantity of oil refined it is impossible to determine from the figures at hand. As stated, however, there is a recognizable relation. In February, 1914, defendant supplied 3,356,000 cubic feet. In December, 1920 it furnished 14,603,255 feet In 38 of the months between September, 1917, and March, 1922, the amount of gas supplied the plaintiff exceeded 10,000,000 feet, the excess ranging from 2,000,000 to 3,000,000 feet.

Not only did defendant, as plaintiff alleges, have knowledge of the growth and development of plaintiff's plant and business, but as the above figures show, the defendant participated in and furthered this development. It now argues, however, that the terms of the contract require it to furnish only such gas as is necessary to refine 10,000 barrels of oil monthly, which amount it estimates at not more than 10,-000,000 cubic feet. We think the act of the defendant in supplying gas in excess of that amount for so long a period and the act of the plaintiff in using it indicates a different construction, a construction which we would not be justified in condemning. *Myers* v. *Carnahan,* 61 W. Va. 414, 57 S. E. 134; *Moore* v. *Ohio Valley Gas Co.,* 63 W. Va. 455, 60 S. E. 401; *Butler* v. *Carlyle,* 84 W. Va. 753, 100 S. E. 736.

Under the circumstances disclosed in plaintiff's original and amended bills, we think the plaintiff is entitled to sufficient gas to operate its refinery at its present capacity, even though that may require more than 10,000,000 feet per month, so long as the defendant is able to furnish it and plaintiff complies with the contract; we will therefore reverse the decree of the circuit court dismissing the cause and dissolving the injunction, will reinstate the injunction heretofore awarded, and remand the cause for further proceedings to be had therein in accord with the principles herein announced and the rules governing courts of equity.

*Reversed; Decree for plaintiff.*