BERKELEY COUNTY PUBLIC SERVICE DISTRICT, *etc.*

*v.*

VITRO CORPORATION OF AMERICA, *a Corporation*

(No. 12704)

Submitted May 7, 1968.          Decided June 25, 1968.

*Rice, Hannis, Rice & Wagner, Lacy I. Rice, John M. Miller,* for appellant.

*Martin & Seibert, Clarence E. Martin, Jr.,* for appellee.

BERRY, PRESIDENT:

This is an appeal by Vitro Corporation of America, a corporation, from a final judgment of the Circuit Court of Berkeley County, West Virginia, of January 13, 1967, in

a declaratory judgment proceeding in which the trial court construed a contract between the plaintiff and defendant and held, among other things, that the defendant, Vitro Corporation of America, was obligated to pay to the plaintiff, Berkeley County Public Service District, the minimum sum of $275 per month for potable water for industrial and sanitary purposes, whether used or not, for a period of 40 years beginning August 1, 1959, and ending July 31, 1999, and rendered judgment against the defendant in the amount of $23,595 for said minimum payments due the plaintiff which accrued after the defendant notified the plaintiff that its plant was closed and that it no longer required any water to be furnished to it.

An appeal and supersedeas were granted by this Court on November 6, 1967, and the case was submitted for decision on arguments and briefs of both parties at the April Special Docket of the January, 1968, Regular Term.

The water contract involved in this case grew out of a projected and actual industrial development in Arden District in Berkeley County, West Virginia, near the City of Martinsburg. In 1952, Thieblot Aircraft Corporation built a plant at or near the Martinsburg Airport worth about $800,000, which was served by water obtained from a well. However, this water was corrosive and not satisfactory for the use of the defendant and a better water supply was desired. In 1956 the Thieblot plant became a division of Vitro Corporation of America and Armand Thieblot, president of Thieblot, became the head of the Thieblot division of the Vitro Corporation when they merged. Around 1954, efforts were made to establish a water service district in the area outside the City of Martinsburg where the municipal airport was located, and where the Thieblot plant had been built. An adequate unutilized supply of good water from a private source was located a few miles from this area, and the City of Martinsburg did not desire to serve the area through its municipal water works. Consequently, action was taken to obtain the output of this private water supply known as LeFevre Springs, which was owned by the descendants of one of the early settlers in that area. Other plants were also located in this area, such as the

C. H. Musselman Company dealing in apple products, which were potential customers of the water service district.

Negotiations of water contracts with Thieblot and other companies and the organization of a water service district were made and undertaken at about the same time. The evidence indicates that the public service district was initially motivated by the prospect of a long-term water contract with Thieblot as well as others and would not have come into being if this prospect had not existed. The plaintiff claims that the resulting contract binds the defendant to pay for water used by it since it ceased operation of its plant in that area in 1960.

The contract which was introduced in the evidence is dated November 18, 1958, was executed by the Vitro Corporation of America on that date and executed by the Berkeley County Public Service District on November 20, 1958, was substituted for a prior contract dated May 1, 1958, which was cancelled by the November 18, 1958, contract, and provided that not later than May 31, 1959, at least some of the water provided for in said contract would be furnished. However, the evidence is uncontradicted that water was not furnished under the contract in question until August 1, 1959. The contract in question contains two conditions upon which charges under the contract were to be made: (1) Available water for fire protection at the rate of $400 per month, and, (2) water which Vitro "shall require" for industrial and drinking purposes at rates to be fixed by the Public Service Commission of West Virginia. Both the water services for fire and industrial and drinking purposes were to continue for a period of 40 years but the charge for the available water for fire protection purposes was subject to an adjustment at the end of ten years from the date of the contract, and every five years thereafter. The water for industrial and drinking purposes was to be furnished to Vitro as it *shall require* at the rates from time to time approved by and on file with the Public Service Commission of West Virginia. The evidence indicates that Vitro understood it was to pay a minimum charge for available water for fire protection purposes with such water to be furnished at 50 pounds pressure,

with immediate availability of 1000 gallons a minute; but as to the clause concerning payments for industrial and drinking water the evidence indicates that Vitro did not understand that it was bound to pay for forty years at a minimum rate, whether water was used or not and regardless of whether or not it remained connected as a customer to the public utility. The contract appears to have been negotiated at Martinsburg by both local and non-resident negotiators, after which it was forwarded to other offices for approval. Considerable evidence as to what the parties intended was introduced by both the plaintiff and the defendant, and each claimed it was entitled to introduce the evidence to settle an incorrect interpretation insisted upon by the other, or that the evidence so introduced was not an interpretation but was merely establishing a collateral fact which caused the contract to be negotiated and executed.

An unusual situation exists in which each party insists that the contract is not ambiguous but is clear, although they came to opposite conclusions as to how to charge under the contract. The trial court judge stated that if the parties were unable to agree as to the conditions of the contract he would consider it ambiguous. This, no doubt, accounts for the numerous objections made throughout the trial by each party to the introduction of evidence by the other touching in any manner on the negotiations of the contract.

The case was tried by the judge in lieu of a jury and the plaintiff introduced considerable evidence showing that after the contract was negotiated a loan was approved by the United States of America Housing and Home Financing Agency to establish the district and that an investment banker sold bonds of the public service district; that neither of these acts would have taken place according to the testimony and documents of the agency and banker except that they, after examination of the contract, concluded that it bound Vitro to pay $400 a month for fire protection and $275 a month for industrial and sanitary water, making a total of $8100 a year to last for 40 years. This evidence was objected to by the defendant on the ground that it was interpreting the contract, which was the prerogative of the court and not the witness. An examination of such evidence

indicates that the witnesses were not connected with the negotiations of the contract but took collateral steps based upon an interpretation of what they thought the contract meant.

Inasmuch as the interpretation of the conditions contained in the contract in question are matters for the court to determine, considered with any proper evidence, the entire contract is hereby quoted:

"THIS AGREEMENT made and entered into in quadruplicate this 18th day of November, 1958, by and between Vitro Corporation of America, a Delaware corporation (hereinafter called 'Vitro'), and Berkeley County Public Service District, a public corporation created under Article 13A of Chapter 16, West Virginia Code of 1955 (hereinafter called 'Berkeley'),

"WHEREAS Vitro owns, and operates through its Thieblot Aircraft Company Division, a plant located near Martinsburg, Berkeley County, West Virginia (hereinafter called the 'Plant'), and is desirous of obtaining for said Plant an adequate source of potable water for fire protection purposes and for industrial and sanitary uses, to be supplied through a public supply and distribution system; and

"WHEREAS, Berkeley is presently engaged in financing the construction of a public water supply and distribution system within Berkeley County, West Virginia, by the issuance of revenue bonds and the execution of contracts for the construction thereof; and,

"WHEREAS the parties hereto entered into an agreement dated the 1st day of May, 1958, providing for certain water service to said Vitro and it is now desired by each of said parties to cancel and annul said agreement and enter into a new agreement relative to such service:

"NOW, THEREFORE, THIS AGREEMENT, WITNESSETH, That for and in consideration of the mutual covenants and premises hereinafter set forth, the parties hereto agree as follows:

"1. The contract and agreement entered and executed by and between the parties hereto dated

the 1st day of May, 1958, is hereby cancelled, annulled and declared to be of no effect and benefit to either of the parties hereto and in place and instead thereof, the parties hereto mutually agree and represent as hereinafter set forth.

"2. (a) Not later than May 31, 1959, Berkeley shall make water available to Vitro for fire protection purposes only, at a rate of flow of not less than 1,000 gallons per minute and at a flow pressure of not less than 50 pounds per square inch, such water to be made available at Vitro's line and/or lines located at the easterly end of a permanent right of way along West Virginia Secondary Route No. 19/1 in Arden District, Berkeley County, West Virginia (said right of way having been perpetually deeded to Thieblot Aircraft Company, Inc., and assigned by the latter to Vitro.)

" (b) For the water made available under paragraph 2 (a) hereof, Vitro shall pay to Berkeley the sum of Four Hundred Dollars ($400.00) monthly in advance on the first day of each month during the term hereof; provided, however, that such sum shall be eligible for adjustment at the end of ten (10) years from the effective date hereof and at the end of each five (5) year anniversary date thereafter upon the approval of the Public Service Commission of West Virginia.

"3. Berkeley shall further furnish to Vitro, at a 6x3x3/4 inch meter located at said Plant, such amounts of potable water for industrial and sanitary purposes as Vitro *shall require* at Berkeley's normal flow and pressure for which Vitro shall pay Berkeley at the rates from time to time approved by and on file with the Public Service Commission of West Virginia.

"4. (a) The term of this contract for water for fire protection shall be deemed to begin on such date Berkeley shall first make available to Vitro the water service referred to in paragraph 2 (a) hereof, and shall continue in force and effect for a period of forty (40) years, thereafter.

" (b) The term of this contract for water service for industrial and sanitary purposes referred to in paragraph 3 hereof shall be deemed to begin on such date Berkeley shall first make available to Vitro its water service for these purposes, and shall con-

tinue in force and effect for a period of at least forty (40) years thereafter.

"5. This agreement shall be binding upon Vitro and Berkeley and their respective successors and assigns. If any person, firm or corporation shall succeed to the ownership of the Plant by purchase, merger or consolidation, then such successor shall be entitled to the rights and be subject to the obligations of Vitro hereunder and Vitro shall have no further obligation or liability hereunder.

"WITNESS the signature of Vitro Corporation of America, a Delaware corporation, by J. Carlton Ward, Jr., its President, and its seal duly affixed this 18th day of November, 1958, and the signature of Berkeley County Public Service District, a public service corporation of West Virginia, by D. M. Wageley, Chairman of Berkeley County Public Service Board, and its seal duly affixed this 20th day of November, 1958." ([Emphasis supplied.]

Under the terms of this contract Vitro continued to pay the fire protection charge and was not in arrears of this charge at the time of the trial. However, after June 30, 1960, it refused to pay for water under the industrial and sanitary provision for which, up until that time, it had been billed at a minimum rate of $275 a month as the Public Service District interpreted certain Public Service Commission's orders to allow it to charge. The evidence shows that during the time Vitro operated it only used about 800,000 gallons of water a month which, if charged for at bracketed rates set by the Public Service Commission, was still a little under the minimum charge provided for in such rates and charges fixed by the Public Service Commission.

After gradually closing its plant in May and June, 1960, Vitro refused to pay for the industrial and drinking water on the ground that it did not *require* any water, and as a result thereof this suit was instituted by the Public Service District against Vitro on November 29, 1962, for a declaratory judgment to construe the contract, declare the rights and obligations thereunder and give judgment for the money claimed due to the plaintiff, the Public Service District.

Apparently, the case remained inactive except for certain pleadings up until 1966 when Vitro forced the Public Service District to answer certain interrogatories which disclosed that the plaintiff intended to use witnesses concerning the period during which the contract was being negotiated. It also appeared that the Circuit Judge had been attorney for the City of Martinsburg when the sale of the ground was negotiated for the Thieblot plant which was later constructed on such real estate formerly owned by the City. Because of the negotiations stated above, counsel for Vitro moved that the judge "recuse" himself, which he stated he would do, but upon objection by counsel for the plaintiff he remained on the bench and heard the case. This is assigned as error by the defendant.

A motion for summary judgment was made by Vitro in 1964 on the ground that the contract was clear and unambiguous but the motion was overruled by the court and such ruling is also made an assignment of error. At the close of the plaintiff's evidence and at the close of all the evidence in December, 1966, the defendant moved that the court find in its favor, which court refused to do. The court then dictated an opinion from the bench finding in favor of plaintiff. The defendant then moved, January 3, 1967, for a new trial, which was within 10 days of the entry of the final judgment, in compliance with Rule 59(b), R. C. P. An amended motion for a new trial and a request for additional findings of the fact and conclusions of law were also made by the defendant on January 6, 1967, and the court granted the motion for additional findings and conclusions but refused the motion for new trial. On January 12, 1967, defendant filed a "supplemental amended motion for a new trial", which court overruled by its final order of January 13, 1967.

It will be noted that the contract, which is quoted verbatim herein, provides that the plaintiff shall furnish to the defendant at a 6x3 x ¾ inch meter located at defendant's plant such amount of potable water for industrial and sanitary purposes as the defendant shall require at plaintiff's normal flow and pressure for which defendant shall

pay to the plaintiff at the rates from time to time approved by and on file with the Public Service Commission of West Virginia. An order of the Public Service Commission dated January 28, 1958, entered about 11 months before the contract in question was executed by the parties, sets up the following rates and charges:

"On December 7, 1957, Berkeley County Public Service District filed an application, duly verified, for (1) a certificate of public convenience and necessity to construct and operate a public water supply system in the County of Berkeley and for (2) authority to place in effect the following schedule of rates and charges:

First      5,000 gallons used per month $2.00 per thousand gals

Next     10,000 gallons used per month   1.50 per thousand gals

Next     35,000 gallons used per month    .80 per thousand gals

Next   950,000 gallons used per month    .30 per thousand gals

## MINIMUM CHARGES

| | |
|---|---|
| 5/8 Inch Meter | $4.00 per month |
| 1  -Inch Meter | 25.00 per month |
| 2  -Inch Meter | 120.00 per month |
| 6x3x3/4 Inch Meter | 275.00 per month |
| 8x4x1-1/2 Inch Meter | 500.00 per month |

## MULTIPLE SERVICE

"Where multiple service is rendered through one meter, the minimum shall be multiplied by the number of families, apartments, and/or business establishments served.

## INDUSTRIAL SERVICE

"For industrial users, the minimum shall be established by negotiation of individual contracts."

\* \* \* \*

"The applicant is hereby granted a certificate of public convenience and necessity authorizing the construction and

operation of a water treatment and distribution system in the district area served by the Berkeley County Public Service District.

*"The schedule of rates and charges requested by the applicant for such service and as hereinbefore set forth is approved, provided, however, that the applicant shall provide the Public Service Commission of West Virginia with a copy of any contract negotiated with any industrial user in the event that the terms of such contract differ in any respect from the rates hereinbefore set forth.*

"The applicant will file with this Commission a tariff in the form prescribed by the Commission setting forth said rates and charges." [Emphasis supplied.]

Two weeks after this first order the Public Service Commission under date February 11, 1958, made the following changes:

"Whereas, by order entered herein on January 28, 1958, the rates and charges for water service which the applicant, Berkeley County Public Service District, had sought authority to place in effect were approved by the Commission, and whereas, the Commission had intended to make certain changes in said rates and charges, but the said changes were inadvertently omitted.

"Now, therefore, it is ordered that said order entered herein on January 28, 1958, be, and it hereby is, amended to provide that the rate of thirty cents (30¢) per thousand gallons shall apply to all water over 50,000 gallons used per month instead of the next 950,000 gallons as stated in said application; and that the provision 'After one month from the date of thereof a penalty of not less than ten per cent (10%) shall be added to all water bills for each additional month or part thereof between the date of the bill and the date of its payment' be changed to 'After one month from the date thereof a penalty of ten per cent (10%) shall be added to all water bills'; and it is further ordered that in all other respects said order of January 28, 1958, shall remain in full force and effect."

Again, on April 10, 1958, 7 months before the contract between the plaintiff and defendant was executed, the

Public Service Commission made another correction specifically set out as follows:

> "Whereas, by order entered herein on January 28, 1958, the rates and charges for water service which the applicant, Berkeley County Public Service District, had sought authority to place into effect were approved by the Commission, and whereas, the schedule of said rates and charges contained the provision 'For industrial users the minimum shall be established by negotiation of individual contracts' when the provision should have read *'For industrial users the rate shall be established by negotiation of individual contracts.'*

> "Now, therefore, it is ordered that said order entered herein on January 28, 1958, be, and it hereby is, amended to provide that 'For industrial users the rate shall be established by negotiation of individual contracts' instead of 'For industrial users the minimum shall be established by negotiation of industrial contracts'; and it is further ordered that in all other respects said order of January 28, 1958, as amended by an order entered herein on February 11, 1958, shall remain in full force and effect." [Emphasis supplied.]

Another order entered by the Public Service Commission dated March 13, 1961, changed the limits of the Public Service District but has nothing to do with the contract in question. It should be noted that the additional order of April 10, 1958 of the Public Service Commission, just quoted, making a correction in its order of January 28, 1958, casts the burden of negotiating individual contracts with reference to rates on the industrial users. This privilege was not utilized as to industrial and sanitary waters in the contract now before the Court to vary the schedules set up by the Public Service Commission, and from an inspection of the contract itself it would have been impossible to ascertain any amount which could be the foundation of a monetary judgment. The specific question before the Court is, even if liability extends for forty years what, if any, is the amount of liability. One must look beyond the face of the contract to find any rates or charges that may be made.

The only minimum or maximum charge provided for in the contract is $400 a month for available water for fire purposes, and there is no mention of minimum charges in the contract for the use of industrial and drinking water that shall be required by the defendant except that the amounts due for such water used by the defendant as required shall be paid to the plaintiff at *rates* from time to time approved by and on file with the Public Service Commission of West Virginia. Those rates are subject to change at any time by order of the Public Service Commission which has continuing jurisdiction to control rates and charges for public utilities.

After the Public Service District was set up certain reconstruction work around the area of the airport was undertaken in such manner that if the large line from the Public Service District to Vitro was not first laid its later installation would be more costly and inconvenient. Inasmuch as the Public Service District did not have enough money on hand, Vitro, in order to obtain water from it at the earliest possible time, loaned the Public Service District $16,500 with which to build the line. This was later paid off by the Public Service District. The line to the Vitro plant, before the plant used water, served only two small residential customers at that time. The 6x3x3/4 inch meter called for in the contract was then installed and water was furnished to the plant on August 1, 1959.

The continued operation of the Vitro plant did not prove feasible for reasons that are not clear in the record. However, a prolonged strike no doubt had some bearing on the matter and it never realized full operation. Apparently, there were never more than 300 men employed at its operation whereas it was contemplated that it would employ about 700. The estimated water consumption for the initial employment of 300 people was about 9,480,000 gallons a year. The testimony of the consulting engineer for the Public Service District was that the fire protection feature determined the size of the pipe line built to the plant. Vitro apparently never used industrial and drinking water in sufficient amounts to exceed the minimum charge for

which it was billed for several months and paid during the time the water was used by it when it was in operation. Vitro was separately billed for the amount for fire protection over which there is no dispute in the present case. It continued to pay each of these charges up until June, 1960, when it ceased operations and the water was cut off by the chairman of the Public Service District at Vitro's request. The defendant continued to pay the $400 per month but ceased to pay the $275 at that time.

Before the defendant ceased to pay the $275 a month, objection had been made to the continuation of the minimum charge of $275 for industrial and drinking water. Certain correspondence was had in April, 1960, by the officials of the defendant company requesting information as to why they were being billed and were paying for water they were not using, at the rate of $275 a month. On June 21, 1960, local counsel in Martinsburg for the defendant addressed a certified letter to Mr. Gail W. Updike, Chairman of the Public Service District, notifying him that the defendant would not pay for any more industrial and sanitary water because none was required and requesting that valves be turned off leading into the plant. Mr. Updike turned off the valve as requested on June 30, 1960. He testified that he had the authority to do so, although other witnesses connected with the Public Service District denied that he had such authority. There is no evidence in the record indicating any corporate action prohibiting the chairman of the Public Service District from having such authority, and it may be presumed that he had authority to take such action. The turning off of the valve on the line furnishing water to defendant's plant resulted in complicating events. The line which went to the remainder of the property around the area of the airport came off the same valve that led to the defendant's plant. The closing of this valve would have cut off the water to other places where no dispute existed. The chairman of the Public Service District discussed this matter with the East Coast Flying Service which was subleasing a part of the premises from the defendant, and it was decided by them that a new two inch line should be built to the East Coast Flying Service with

a new separate meter in order that it could obtain water through its own line after the large pipe line into the defendant's plant was closed. This was accordingly done under the supervision of the chairman of the Public Service District and the East Coast Flying Service was billed separately from that time on for water used by it through its own meter. Defendant's plant was locked and not thereafter entered by any representative of the Public Service District for about three years and it was believed by all that the defendant was receiving no water. A caretaker was employed by the defendant to look after its closed plant, and he assumed that no water was in the defendant's pipes; and in order to keep the fire protection pumps and water lines, which were still available for use, from freezing, he maintained a low level of steam boiler heat by the process of having water hauled into the plant in tanks, placed on a higher level, and allowed to run down by garden hose into the boilers.

After a considerable period of time, perhaps in 1963, both the caretaker and a representative of the Public Service District, who for some unknown reason was in the defendant's plant with the caretaker, happened to turn a spigot in the building and discovered that to their surprise it had water in it under pressure. The only way this could be explained by witnesses familiar with the aspect of the property was that a small water line apparently existed from the East Coast Flying Service building to the main building of the defendant which may have been buried there before even the Public Service District was organized at a time when other water was used by the defendant. This line was apparently forgotten and it still fed water from the East Coast Flying Service meter over to the next building which was approximately 100 feet away. It was admitted by all of those familiar with the matter that this water if used in the Vitro plant would have been charged to the East Coast Flying Service account. As a result a confused situation exists in which the plaintiff is attempting to collect for water as if left connected that its chairman had cut off at the main valve leading to the defendant's plant in such manner that he believed that no water could

have been used, although the plaintiff now questions his right to take such action; but the actual situation was that the water was still on from another meter which was unknown to the defendant. Consequently, we have a situation in which the physical facts were the exact opposite of what each party thought they were.

The trial court also found and declared over the objection of counsel for the defendant and carried into the judgment order, the statement that the defendant was required to pay the minimum charge of $400 a month for the next forty years for the fire protection water referred to in the contract unless adjusted in accordance with the contract. The defendant assigns this action as error on the part of the trial court because no request was made for such decision and such matter was not before the court.

The mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court. *Whiting Stoker Co.* v. *Chicago Stoker Corporation*, 171 F. 2d 248. See *In the Matter of the Estate of Elmer Resseger, Deceased, Mary E. Resseger, etc.* v. *G. Thomas Battle, etc.*, 152 W. Va. 216. (Decided by this Court 5-28-68).

Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract, and in such case the intention of the parties is always important and the court may consider parol evidence in connection therewith as to conditions and objects relative to the matters involved. *Jackson Hill Coal & Coke Co.* v. *Merchants Heat & Light Co.*, 193 Ind. 422, 140 N. E. 532; *Ruth-Hastings Glass Tube Co.* v. *Slattery*, 266 Pa. 288, 109 A. 695. However, where the language of a contract is clear the language cannot be construed and must be given effect and no interpretation thereof is permissible. *State ex rel. Ashworth* v. *Road Commission*, 147 W. Va. 430, 128 S. E. 2d 471.

This matter is succinctly stated in the fourth point of the syllabus in the case of *Cotiga Development Company* v. *United Fuel Gas Company*, 147 W. Va. 484, 128 S. E.

2d 626, wherein it is stated: "The rule relating to practical construction of provisions of a written instrument by the conduct of the parties thereto, like other rules of construction, may be resorted to by a court only when the parties have failed to express their intent in clear and unambiguous language; and such rule of construction can never be used to change the legal effect of clear and unambiguous language." The type of contract involving purchases of amounts "as required", "as necessary", and synonomous expressions are called in law "requirements contracts". The present case illustrates one of that category.

Requirement contracts are approved by the authorities but must be administered and complied with in good faith. Annotation 7 A. L. R. 498 et seq.; Annotation 26 A. L. R. 2d 1099 et seq.; *Smoot* v. *United States*, 237 U. S. 42, 35 S. Ct. 540, 59 L. Ed. 829; *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673; *Elk Refining Co.* v. *Falling Rock Cannel Coal Co.*, 92 W. Va. 479, 115 S. E. 431. In construing a requirement contract the test, as Justice Holmes once said, is what is the "obviously dominant measure", and if the language of such contract clearly makes it a "requirement" contract then the only thing for which parol evidence can be introduced is to establish what are the requirements. *Smoot* v. *United States*, 237 U. S. 42, 35 S. Ct. 540, 59 L. Ed. 829; *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673.

In the West Virginia case of *Elk Refining Co.* v. *Falling Rock Cannel Coal Co.*, 92 W. Va. 479, 115 S. E. 431, the contract in effect was for the furnishing of a certain product that *might be needed* by the Refining Company. However, it referred to a period of ten years and also to the quantity needed for certain purposes. Although the contract did not use the words *requirement* or *shall require,* by implication its place was in that category and the reason for parol evidence was to ascertain whether or not more than the quantity referred to in the contract had to be supplied and in that case it was held that the extrinsic evidence introduced by the parties established their interpretation of the agreement because the defendant continued to supply over

a long period of time many times more than the quantity of the product mentioned.

The pleading in the declaratory judgment proceeding in the case presented here is clearly limited to the provisions of paragraphs 3 and 4 (b) of the contract entered into by the parties on November 18, 1958, because the pertinent part of the allegations in the complaint, after referring to the contract, reads as follows:

"* * * 4. Defendant has paid to the plaintiff all sums of money due and owing to plaintiff, up to and including the 30th day of June, 1960, from which time, to date, defendant refuses to comply with the terms of said agreement, in this, that it refuses to pay to the plaintiff the minimum monthly charge for water, required by the terms of paragraphs 3 and 4 (b) of said agreement, which is the monthly sum of $275.00 and although often demanded and requested of it, defendant refuses to pay any further sum or sums of money under the aforesaid paragraphs of said agreement to plaintiff. * * *

"WHEREFORE, plaintiffs demands judgment:

"1. That the aforesaid agreement, to-wit, Exhibit 'A', be construed and interpreted.

"2. That the rights and obligations of the parties hereto, under said agreement, and in particular under paragraphs 3 and 4 (b) be declared and fixed.

"3. Against the defendant, in favor of the plaintiff in an amount equal to the sum of money due and owing to the plaintiff, in accordance with the declaration and determination of the rights and obligations of the parties hereto, as aforesaid, at the time of such determination or declaration, with interest and costs."

No reference is made to any provisions of the contract except by paragraphs 3 and 4 (b), and no sum of money was due and owing to the plaintiff at the time the complaint was filed, except under paragraphs 3 and 4 (b), and there was no controversy with regard to any other provisions of the contract as the parties had apparently agreed with regard to the other provisions. The trial court therefore returned a declaratory judgment for more than was requested by the plaintiff over the objections of the defendant.

Inasmuch as the only provisions of the contract in controversy at this time are paragraphs 3 and 4(b), they are again quoted as follows:

> "3. Berkeley shall further furnish to Vitro, at a 6x3x3/4 inch meter located at said Plant, such amounts of potable water for industrial and sanitary purposes as Vitro *shall require* at Berkeley's normal flow and pressure for which Vitro shall pay Berkeley at the rates from time to time approved by and on file with the Public Service Commission of West Virginia.
>
> \* \* \* \*
>
> "(b) The term of this contract for water service for industrial and sanitary purposes referred to in paragraph 3 hereof shall be deemed to begin on such date Berkeley shall first make available to Vitro its water service for these purposes, and shall continue in force and effect for a period of at least forty (40) years thereafter." [Emphasis supplied.]

In plain language, these provisions provide for the plaintiff to furnish potable water for industrial and sanitary purposes to the defendant, as it *shall require,* for a period of 40 years, and the defendant agreed to pay for such water at the rates from time to time fixed by the Public Service Commission of West Virginia. There is no minimum rate fixed in the contract for the industrial water as is fixed for the water for fire purposes, and the only reference to a minimum charge is contained in the Public Service Commission order of January 28, 1958, after the rates for the furnishing of such water were set out. This order of the Public Service Commission was proper to be proved by parol evidence in the trial of this case because it was incorporated by reference in the contract. *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.,* 147 Va. 125, 136 S. E. 673. The provisions of the contract contained in paragraph 3 allowed the rates to be changed at any time by the Public Service Commission of West Virginia and the order of the Public Service Commission dated January 28, 1958, as amended by the order of April 10, 1958, allowed such rates to be negotiated by the parties at any time. The clear and unambiguous language contained in paragraph 3, which needs no construction or interpretation, is that

the plaintiff shall furnish industrial water to the defendant as it shall require. This last phrase is the "obviously dominant measure" contained in the contract with regard to the matter in controversy. The provision for the payment for such water is subservient or incidental and if the defendant required no water there would be no charge, minimum or otherwise. However, under the terms of the contract contained in paragraph 4 (b) if the defendant required water it would have to pay for it at the agreed rate for a period of 40 years unless otherwise negotiated and the plaintiff would have to furnish it for such period of time if it remained in the business of furnishing water. Annotation 7 A. L. R. 498; *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673.

Under a requirement contract there is no duty on the part of the buyer to have any requirements and when a buyer's plant is closed or his activities changed in good faith for valid business reasons there are no requirements for water or whatever commodity is being sold; and there can be no recovery under a requirement contract for furnishing water where there is no water required and none furnished. Annotation 7 A. L. R. 498, 507; *Drake* v. *Vorse*, 52 Iowa 417, 3 N. W. 465; *Fort Wayne Cor. Paper Co.* v. *Anchor Hocking Glass Corp.*, 130 F. 2d 471. Inasmuch as it clearly appears that the requirement provision in the contract in the case at bar is a dominant provision, and this has been held to be the guiding rule in the decisions of such cases, there is no need for any construction or interpretation of the contract and the plain words of the contract must be applied. There being no requirement by the defendant for any water after it closed, there can be no recovery for any minimum charge or any other charge for unused water. Annotation 26 A. L. R. 2d 1099, 1123; *Smoot* v. *United States*, 237 U. S. 42, 35 S. Ct. 540, 59 L. Ed. 829; *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673.

The fact that the defendant paid the minimum charge of $275 a month for almost a year would have no effect on the

right of recovery by the plaintiff where there was absolutely no requirement for the furnishing of water. However, because of the fact that the defendant paid the $275 a month without protesting for several months and did not use the minimum requirement it may well be that by virtue of acquiescence in such payments it would be bound to continue paying the $275 a month if it continued to require water at its plant. *Elk Refining Co.* v. *Falling Rock Cannel Coal Co.*, 92 W. Va. 479, 115 S. E. 431.

The fact that the trial judge was attorney for the City of Martinsburg when negotiations were made for the sale of the property to the defendant, or its predecessor, did not disqualify him from sitting in the case at bar because such negotiation had nothing to do with the issue presented before him in this case. Therefore, there was no merit to defendant's motion or request for him to disqualify himself. 48 C. J. S., Judges, §79; 30 Am. Jur., Judges, §§101, 102; 11 M. J., Judges, §14; *State ex rel. Ashworth* v. *State Road Commission*, 147 W. Va. 430, 128 S. E. 2d 471; *Cotiga Development Company* v. *United Fuel Gas Company*, 147 W. Va. 484, 128 S. E. 2d 626.

It was clearly error for the trial court to allow the witnesses who testified on behalf of both the plaintiff and defendant to give their interpretation, or construction, of the contract. This is a matter of law for the court to decide. The extrinsic evidence relating to the background and negotiations with regard to the forming of the Public Service District would only be proper where the language of the contract upon which the decision is necessary is ambiguous; but where, as in the case at bar, the language is clear and unambiguous that the plaintiff shall furnish water as the defendant shall require, there is no need for such extrinsic evidence. *State ex rel. Ashworth* v. *State Road Commission,* 147 W. Va. 430, 128 S. E. 2d 471; *Cotiga Development Company* v. *United Fuel Gas Company*, 147 W. Va. 484, 128 S. E. 2d 626. It was, of course, proper to introduce evidence of the order of the Public Service Commission which was incorporated by reference in the contract. *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673.

It was not error for the trial court to admit evidence that the defendant had loaned the plaintiff $16,500 to facilitate the laying of pipe to the defendant's plant in order to furnish it with water. This evidence had little bearing on the issue and, in such case, has been held to be proper in showing the background of the contract. *Mathieson Alkali Works* v. *Virginia Banner Coal Corp.*, 147 Va. 125, 136 S. E. 673.

It is noted from the opinion of the trial court contained in the record which can be considered by this Court in order to determine the basis or reason for the court's decision, that it recognized at the time the summary judgment was disposed of that the only issue involved was the construction of paragraphs 3 and 4 (b) relative to the payment of the minimum charge of $275 per month for industrial water. *Sargent* v. *Malcomb*, 150 W. Va. 393, 394, 146 S. E. 2d 561; *Work* v. *Rogerson*, 152 W. Va. 169, 160 S. E. 2d 159, (decided by this Court March 26, 1968). It therefore appears from the record in the case at bar that the defendant's motion for a summary judgment of March 26, 1964, based on the complaint and contract which was filed as Exhibit A at the time the summary motion was made should have been granted by the trial court since the answer to the complaint and the motion itself clearly showed that the plant was closed and there was no need for industrial water. See Rules 12c and 56c, R. C. P.; *Aetna Casualty and Surety Co.* v. *Fed. Insurance Company of New York*, 148 W. Va. 160, 133 S. E. 2d 770; *Employers' Liability Assurance Corp.* v. *Hartford Accident and Indemnity Co. and Jewell Ridge Coal Corp.*, 151 W. Va. 1062, 158 S. E. 2d 212, (decided by this Court December 21, 1967).

For the reasons stated herein, the judgment of the Circuit Court of Berkeley County is reversed and a new trial is awarded to the defendant.

*Judgment reversed;*
*new trial awarded.*