589 S.E.2d 507

**In re JOSEPH G.**

No. 31221.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 2003.

Decided Nov. 3, 2003.

Darrell V. McGraw, Jr., Esq., Attorney General, Charleston, Rocco S. Fucillo, Esq., Assistant Attorney General, Fairmont, for the Appellant, West Virginia Department of Health and Human Resources.

Jeffrey K. Matherly, Esq., Heather G. Harlan, Esq., Bowles Rice McDavid Graff &

Love PLLC, Charleston, for the Appellee, Stepping Stone, Inc.

Catherine D. Munster, Esq., McNeer, Highland, McMunn and Varner, L.C., Clarksburg, for the minor child, Joseph G.

PER CURIAM.

The appellant herein, the West Virginia Department of Health and Human Resources [hereinafter referred to as "DHHR"], appeals from an order entered April 29, 2002, by the Circuit Court of Harrison County. In that order, the circuit court ruled that DHHR was obligated to pay the appellee herein, Stepping Stone, Inc. [hereinafter referred to as "Stepping Stone"], a per diem rate for Joseph G.'s care equal to the amount to which Stepping Stone would have been entitled under Medicaid. On appeal to this Court, DHHR disputes that it is obligated to pay these monies to Stepping Stone. Upon a review of the parties' arguments, the pertinent authorities, and the record designated for appellate consideration, we affirm the decision of the Harrison County Circuit Court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In February, 1992, DHHR assumed custody of Joseph G. as a result of an abuse and neglect proceeding. After numerous unsuccessful placements, and in light of his various behavioral problems, Joseph was housed at Stepping Stone, a nonprofit corporation which operates a nine-bed child care residential facility, on June 29, 1999. Since his placement at this facility, Joseph has progressed remarkably, no longer exhibits behavioral problems, and does well in school. In light of the success of this placement, Joseph's multidisciplinary team[1] recommended that his permanency plan should continue his placement at Stepping Stone until such time as he would be eligible to enter an independent (transitional) living program[2] at the end of the 2001–2002 school year, i.e., May 28, 2002. During his placement at Stepping Stone, DHHR and Stepping Stone had a contractual arrangement whereby DHHR paid a per diem fee for Joseph's room, board, care, and supervision.[3] Additionally, because Stepping Stone provides certain medical services to its residents, it generally is entitled to an additional Medicaid rate per client per day.[4] The specific time period during which Stepping Stone is entitled to receive these Medicaid monies for Joseph's care is the source of the present controversy.

Pursuant to a scheduled review of juveniles within DHHR's custody and the Medicaid services they were receiving, an Administrative Services Organization[5] [hereinafter referred to as "ASO"] determined, in January, 2002, that Joseph no longer required the services of Stepping Stone and, thus, that he was no longer entitled to the same. Moreover, the ASO made this determination retroactive finding that Joseph's Medicaid eligibility for said services had ceased on November

---

1. Multidisciplinary teams "assist courts in facilitating permanency planning, following the initiation of judicial proceedings, to recommend alternatives and to coordinate evaluations and in-community services." W. Va.Code § 49–5D–1(a) (1998) (Repl.Vol.2001). Typically, a multidisciplinary treatment team is comprised of

   the child's custodial parent or parents, guardian or guardians, other immediate family members, the attorney or attorneys representing the parent or parents of the child, the guardian ad litem, if any, the prosecuting attorney or his or her designee and any other person or an agency representative who may assist in providing recommendations for the particular needs of the child and family. The child may participate in multidisciplinary treatment team meetings if such is deemed appropriate by the multidisciplinary treatment team.

   W. Va.Code § 49–5D–3(b) (2003) (Supp.2003).

2. Typically, state and federal guidelines require a juvenile to be seventeen years old before he/she may enter an independent living arrangement. Joseph turned seventeen on May 16, 2002.

3. This rate is approximately $92.78 per day and is paid by the Office of Social Services [hereinafter referred to as "OSS"].

4. This amount is approximately $38.18 per day and is paid by the Bureau for Medical Services [hereinafter referred to as "Medicaid"].

5. DHHR represents that the function of an Administrative Service Organization, or ASO, "is to review and ensure that appropriate services are being utilized [by] Medicaid clients. The ASO in advance must approve and authorize continued treatment by a facility to [permit it to] be compensated."

1, 2001. In order to permit Joseph to nevertheless remain at Stepping Stone, his counsel moved the court, in February, 2002, for an order to that effect. Ultimately, DHHR, Stepping Stone, and Joseph's counsel acquiesced to an agreed order whereby DHHR would waive the independent living age requirement and expedite efforts to place him in such a setting; in the meantime, Joseph would remain at Stepping Stone. Because Joseph was not entitled to Stepping Stone's Medicaid services, however, the instant controversy ensued as to whether Stepping Stone could nonetheless recover such Medicaid monies from DHHR for the period from November 1, 2001, until his discharge from Stepping Stone on April 17, 2002.[6]

On November 1, 1998, DHHR and Stepping Stone entered into a Child Care Agreement [hereinafter referred to as "Agreement I"]. Pertinent to the instant controversy, this contract provided that "the Office of Social Services shall pay the treatment rate established by the Office of Audits, Research, and Analysis for those youth for whom treatment was provided but which cannot be billed to Medicaid because [the] child was not eligible for the service under Medicaid regulations." Agreement I, at Article XV. Agreement I remained in force and effect through December 31, 2001. In light of the above-quoted language, DHHR concedes that it is obligated to pay the Medicaid monies to Stepping Stone for the contract period Joseph was housed at Stepping Stone but was not eligible for Medicaid services, i.e., November 1, 2001, through December 31, 2001, which sum is approximately $2,328.98.[7]

Thereafter, DHHR and Stepping Stone entered into a Group Residential Provider Agreement [hereinafter referred to as "Agreement II"], which replaced Agreement I, and remained in force and effect from January 1, 2002, through December 31, 2002. Unlike the parties' prior Agreement I, Agreement II does not contain any language to indicate who is responsible for the payment of Medicaid monies if a Stepping Stone resident is deemed to be ineligible for such services. Therefore, the parties disagree as to who is liable for such Medicaid payments for Joseph's residence at Stepping Stone from January 1, 2002, until his discharge on April 17, 2002. At the per diem Medicaid rate of $38.18, the total amount in controversy is approximately $4,085.26.[8]

By order entered April 29, 2002, the Circuit Court of Harrison County determined DHHR to be liable to Stepping Stone for the theretofore unreimbursed Medicaid monies for Joseph's residence at that facility:

The Court ... finds that based upon the intent of the parties, as evidenced by other contractual terms, Stepping Stone was no longer obligated to keep Joseph at its facility, absent a court order, once Joseph failed to meet the target population admission criteria and the ASO determined that treatment provided by Stepping Stone was no longer medically necessary.

The Court further finds that although Joseph no longer met the target population admission criteria and treatment provided by Stepping Stone was no longer medically necessary, the Department, Stepping Stone and the MDT agreed that Joseph's best interests would be served by his con-

---

6. Following his discharge and placement in an independent transitional living program, Joseph reverted back to the behavioral and social problems he exhibited prior to his initial admission to Stepping Stone. Consequently, Joseph was determined to once again be medically eligible for the Medicaid services Stepping Stone provides; his independent living program was terminated; and he was re-admitted to Stepping Stone in order to receive such services. Joseph's current permanency plan envisions that he will remain at Stepping Stone until six months after his eighteenth birthday, which was on May 16, 2003. Payment for this period of Joseph's residency at Stepping Stone is not disputed and is not at issue in the present appeal.

7. The sum of $2,328.98, for which DHHR accepts responsibility under Agreement I, represents the cost of the Medicaid services Joseph received at Stepping Stone from November 1, 2001, until December 31, 2001, when Agreement I ended.

8. The sum of $4,085.26, the payment of which is in controversy in this case, represents the cost of the Medicaid services Joseph received at Stepping Stone from January 1, 2002, until his discharge from Stepping Stone on April 17, 2002.

tinued placement at Stepping Stone rather than an alternative placement.

The Court further finds that Stepping Stone had the right to condition Joseph's continued placement at its facility upon payment by the Department because, under the Current Agreement [Agreement II], Stepping Stone was not required to keep Joseph at its facility once he failed to meet the target population admission criteria and treatment was deemed no longer medically necessary.

From this ruling of the circuit court, DHHR appeals to this Court.

## II.

## STANDARD OF REVIEW

The sole issue presented by the instant appeal requires us to interpret the contract entered into by DHHR and Stepping Stone. We previously have held that " '[i]t is the province of the Court, and not of the jury, to interpret a written contract.' Syl. Pt. 1, *Stephens v. Bartlett,* 118 W.Va. 421, 191 S.E. 550 (1937)." Syl. pt. 1, *Orteza v. Monongalia County Gen. Hosp.,* 173 W.Va. 461, 318 S.E.2d 40 (1984). This is so because "the determination of what constitutes a contract under our relevant cases is a question of law...." *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 62 n. 18, 459 S.E.2d 329, 339 n. 18 (1995). *Accord* Syl. pt. 1, in part, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of America,* 152 W.Va. 252, 162 S.E.2d 189 (1968) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court."). Accordingly, "[w]hether a contract is ambiguous is a legal question reviewable by this Court *de novo.*" *Williams,* 194 W.Va. at 65 n. 23, 459 S.E.2d at 342 n. 23 (citation omitted). *See also id.,* 194 W.Va. at 62 n. 18, 459 S.E.2d at 339 n. 18 ("[I]n interpreting a contract, a court determines the existence of an ambiguity as a matter of law." (internal quotations and citations omitted)). Mindful of this standard, we proceed to consider the parties' arguments.

## III.

## DISCUSSION

On appeal to this Court, we are asked to interpret the contractual agreement entered into by DHHR and Stepping Stone to determine whether DHHR is obligated to pay a per diem rate for Joseph's care equivalent to the amount to which Stepping Stone would have been entitled had Joseph been Medicaid eligible to receive Stepping Stone's services.

In support of its assignment of error, DHHR contends that the language of Agreement II is plain and easily resolves the instant controversy. Unlike Agreement I, Agreement II is silent as to who is responsible for the payment of Medicaid monies once a resident child is no longer eligible for said Medicaid services. Because Agreement II further states that it "contains all the terms and provisions relating to the subject matter hereof and there are no other understandings, oral or otherwise," Agreement II, at Article XIV, § 4, DHHR asserts that the circuit court should have applied, rather than construed, the parties' contract. *Citing* Syl. pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962) ("A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.").

Stepping Stone responds by stating that the circuit court correctly determined DHHR to be responsible for the Medicaid monies at issue herein. Under the terms of Agreement II, the prior provisions of Agreement I were revised in order to prevent a situation such as the one at issue here by permitting Stepping Stone to accept only those youth who are medically eligible for the Medicaid services it provides. Because Agreement II does not resolve the situation at hand, where a resident is deemed to be medically ineligible for Medicaid services but nevertheless continues to be housed at Stepping Stone, Stepping Stone urges the Court to look outside the parameters of the contract in order to resolve this dispute. *Citing* Syl. pt. 2, in part, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of America,* 152 W.Va. 252, 162

S.E.2d 189 (1968) ("Extrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract, and in such case the intention of the parties is always important[.]"). In this regard, Stepping Stone contends that this Court should be instructed by the terms of Agreement I in resolving this dispute as Joseph was admitted to Stepping Stone under those terms.

■ The sole issue presented by the instant appeal requires us to determine whether the parties' contractual agreement required DHHR to pay Stepping Stone the monies to which it claims to be entitled. Ordinarily, "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962). However, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syl. pt. 1, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of America*, 152 W.Va. 252, 162 S.E.2d 189 (1968).

■ In making such a determination of contractual ambiguity, we consider whether the subject contract is capable of more than one interpretation. Thus, "[c]ontract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syl. pt. 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W.Va. 275, 569 S.E.2d 796 (2002). Once we have determined a contract to be ambiguous, we look to the parties' relationship to glean the parties' intent in entering into the agreement under scrutiny. "Evidence of usage or custom may be considered in the construction of language of a written instrument which is uncertain or ambiguous but may not be considered to alter the legal effect of or to engraft stipulations upon language which is clear and unambiguous." Syl. pt. 5, *Cotiga*, 147 W.Va. 484, 128 S.E.2d 626.

■ Having reviewed the contract in question, we find it to be ambiguous insofar as it does not clearly indicate which party is responsible for payment of the Medicaid funds to which Stepping Stone would have been entitled had Joseph been eligible for such services from January 1, 2002, until April 17, 2002. Given the parties' prior dealings under Agreement I, DHHR clearly would have been required to reimburse Stepping Stone.[9] Upon execution of Agreement II, however, the parties attempted to prevent the present scenario by specifically providing that "[y]outh admitted to group residential program(s) shall meet the targeted population admission criteria for the level of treatment offered by Provider as established by the Bureau for Medical Services." Agreement II, at Article I, § 3.06. Thus, Agreement II does not contemplate a situation such as the one presented herein because every child housed at Stepping Stone would first have to have been certified as medically eligible to receive the facility's services.

Despite this strategic wording, the fact nevertheless remains that a non-medically eligible child, namely Joseph, was, in fact, housed at Stepping Stone while Agreement II was in force and effect. That said, some party is responsible either for paying for the Medicaid services Joseph received while in residence at Stepping Stone or for absorbing such costs. We find, based upon the parties' prior agreement addressing similar situations, that DHHR is the party responsible for such costs. To find otherwise would, in short, be unjust and inequitable, particularly when, under the parties' second agreement, Stepping Stone was prohibited from discharging Joseph because no other placement plan had been devised, much less implemented, for him. *See* Agreement II, at Article I, § 5.01 ("Provider shall not discharge a youth meeting targeted population criteria without an appropriate plan and living arrangement agreed upon by the child's MDT except in the event of court ordered discharges and as

9. *See supra* Section I.

allowed in Section XIII.3.03(1–4).").   Accordingly, we affirm the circuit court's ruling imposing such liability upon the West Virginia Department of Health and Human Resources.

## IV.

## CONCLUSION

For the foregoing reasons, the April 29, 2002, order of the Circuit Court of Harrison County is hereby affirmed.

Affirmed.