IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 23-589

_____

FILED

June 11, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JACKLIN ROMEO, SUSAN S. RINE, and DEBRA SNYDER MILLER,
Plaintiffs Below, Petitioners,

v.

ANTERO RESOURCES CORPORATION,
Defendant Below, Respondent.

_____

Certified Questions from the
United States District Court for the Northern District of West Virginia
The Honorable Thomas S. Kleeh, Chief Judge
Civil Action No. 1:17-CV-88-TSK-MJA

CERTIFIED QUESTIONS ANSWERED
_____

Rehearing Granted: December 31, 2024
Submitted Upon Rehearing: April 22, 2025
Filed:  June 11, 2025

George A. Barton, Esq.
Barton and Burrows, LLC
Mission, Kansas


L. Lee Javins II Esq.
Taylor M. Norman, Esq.
Bailey, Javins & Carter, L.C.
Charleston, West Virginia

W. Henry Lawrence, Esq.
Amy M. Smith, Esq.
Lauren K. Turner, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia


Elbert Lin, Esq.
Hunton Andrews Kurth LLP
Richmond, Virginia

Howard M. Persinger, III
Persinger & Persinger, L.C.
Charleston, West Virginia
Counsel for Petitioners

Daniel T. Donovan, Esq.
Kirkland & Ellis LLP
Washington, D.C.
Counsel for Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD, deeming himself disqualified, did not participate in the decision of this case.

JUDGE HARDY, sitting by designation.

JUSTICE WALKER dissents and reserves the right to file a separate opinion.

JUSTICE BUNN dissents and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1.      "'"A *de novo* standard is applied by this court in addressing the legal issues presented by a [sic] certified questions from a federal district or appellate court." Syl. Pt. 1, *Light v. Allstate Ins. Co.,* 203 W.Va. 27, 506 S.E.2d 64 (1998).' Syllabus Point 2, *Aikens v. Debow,* 208 W.Va. 486, 541 S.E.2d 576 (2000)." Syl. Pt. 1, *Harper v. Jackson Hewitt, Inc.*, 227 W. Va. 142, 706 S.E.2d 63 (2010).

2.      "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. Pt. 4, *Wellman v. Energy Res., Inc.,* 210 W. Va. 200, 557 S.E.2d 254 (2001).

3.      Except as may be specifically provided by the parties' agreement, where an oil and gas lease contains an express or implied duty to market, the requirements of *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 219 W. Va. 266, 633 S.E.2d 22 (2006), extend to the point of sale, not just to the point of marketability or to the first available market.

4.      Except as may be specifically provided by the parties' agreement, royalties are payable to the mineral owner/lessor not only from the producer/lessee's sale of wet gas

i

and residue gas but also from the lessee's sale of any byproducts of the wet gas such as natural gas liquids.

5.      "'The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.' Syllabus Point 1, *Martin v. Consolidated Coal & Oil Corp.,* 101 W.Va. 721, 133 S.E. 626 (1926)." Syl. Pt. 7, *Est. of Tawney*, 219 W. Va. 266, 633 S.E.2d 22 (2006).

6.      "'The question as to whether a contract is ambiguous is a question of law to be determined by the court.' Syllabus Point 1, in part, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.,* 152 W.Va. 252, 162 S.E.2d 189 (1968)." Syl. Pt. 5, *Est. of Tawney*, 219 W. Va. 266, 633 S.E.2d 22 (2006).

7.      "Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-

production costs." Syl. Pt. 10, *Estate of Tawney v. Columbia Nat. Res. L.L.C.,* 219 W. Va. 266, 633 S.E.2d 22 (2006).

8.     Absent express language in a gas lease sufficient to satisfy the requirements set forth in syllabus point ten of *Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 219 W. Va. 266, 633 S.E.2d 22 (2006), a producer/lessee may not deduct from a mineral owner/lessor's royalties a proportionate share of the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale.

WOOTON, Chief Justice:

This matter is before the Court upon an October 12, 2023, order of the United States District Court for the Northern District of West Virginia which certified the following questions:[1]

> Question No. 1: Do the requirements of *Wellman v. Energy Resources, Inc.,* [210 W. Va. 200, 557 S.E.2d 254 (2001)], and *Estate of Tawney v. Columbia Natural Resources, [L.L.C.],* [219 W. Va. 266, 633 S.E.2d 22 (2006)], extend only to the "first available market" as opposed to the "point of sale" when the duty to market is implicated?
>
> Question No. 2: Does the first marketable product rule extend beyond gas to require a lessee to pay royalties on natural gas liquids ("NGLs"), and if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale?

On November 14, 2024, this Court issued an opinion answering the first certified question in the negative, the first prong of the second certified question in the affirmative, and the second prong of the second certified question in the negative. Thereafter, on December 16, 2024, Respondent Antero Resources Corporation ("Antero") filed a petition for rehearing, which was granted; a new scheduling order was established; and re-argument was held on April 22, 2025. Upon careful review of the parties' original

---

[1] West Virginia Code section 51-1A-3 (2016) provides:

> The Supreme Court of Appeals of West Virginia may answer a question of law certified to it by any court of the United States . . . if the answer may be determinative of an issue in a pending case in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.

1

and supplemental briefs and oral arguments, the briefs of amicus curiae submitted both in the original appeal and in the rehearing proceedings,[2] the appendix record, and the applicable law, we again answer the first certified question in the negative, the first prong of the second question in the affirmative, and the second prong of the second question in the negative, and remand this matter to the district court for such further proceedings as that court may deem appropriate.

## I.     Facts and Procedural Background

The underlying case, a class action lawsuit alleging breach of contract claims against Antero, was brought by class representatives Jacklin Romeo, Susan S. Rine, and Debra Snyder Miller (collectively "the petitioners") in district court. Each of the petitioners allege ownership of oil and gas interests in Harrison County, West Virginia, subject to existing leases in which the original lessee assigned his or their interests to Antero.

Petitioner Romeo is the assignee of a portion of the lessors' interest under a March 14, 1984, lease agreement ("the Mutschelknaus lease") entered into between the lessors Jessie J. Nixon, Betty Nixon, Mary Alice Vincent, and Hubert L. Vincent, and the

---

[2] We acknowledge the amicus curiae briefs filed by the West Virginia Royalty Owners' Association and West Virginia Farm Bureau, the Gas and Oil Association of West Virginia, Inc., the West Virginia Chamber of Commerce, and the State of West Virginia, and thank these entities for giving the Court the benefit of their respective positions on the issues.

2

lessee Clarence W. Mutschelknaus, Antero's predecessor in interest. The royalty provision in the Mutschelknaus lease is as follows:

> In consideration of the premises, the said [lessee] covenants and agrees: First, to deliver monthly to the credit of the Lessors, their heirs or assigns, free of costs, in a pipeline, to which Lessee may connect its wells, Lessors' proportionate share of the equal one-eighth (1/8) part of all oil produced and saved from the leased premises; and second, to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the value at the well of the gas from each and every gas well drilled on said premises, the product from which is marketed and used off the premises, said gas to be measured at a meter set on the farm, and to pay monthly Lessors' proportionate share of the one-eighth (1/8) of the net value at the factory of the gasoline and other gasoline products manufactured from casinghead gas.

Petitioners Rine and Miller are the assignees of portions of the lessors' interest under an October 19, 1979, lease agreement ("the Matthey lease") between the lessors Lee H. Snyder and Olive W. Snyder, and the lessee Robert L. Matthey, Jr., Antero's predecessor in interest. The royalty provision in the Matthey lease is as follows:

> (a) Lessee covenants and agrees to deliver to the credit of the Lessor, his heirs or assigns, free of cost, in the pipe line to which said Lessee may connect its wells, a royalty of one-eighth (1/8) of native oil produced and saved from the leased premises.

> (b) Lessee covenants and agrees to pay Lessor as royalty for the native gas from each and every well drilled on said premises producing native gas, an amount equal to one-eighth (1/8) of the gross proceeds received from the sale of the same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises, payable quarterly.

The petitioners allege that Antero has breached the terms of the royalty provisions in both the Mutschelknaus and Matthey leases by failing to pay them the full one-eighth royalty specified in the leases. Specifically, the petitioners contend that pursuant to this Court's decisions in *Wellman* and *Estate of Tawney,* Antero was prohibited from deducting postproduction costs from the gross sale proceeds of the gas in calculating the petitioners' royalties. In response, Antero's position is that *Wellman* and *Estate of Tawney* prohibit such deductions only until the oil and gas reach the first available market, not the point of sale, and that Antero is entitled to deduct all postproduction costs incurred in processing, fractionating, and marketing byproducts of the gas produced from petitioners' wells, i.e., the residue gas and the natural gas liquids ("NGLs").[3]

Of relevance to the parties' legal arguments, it appears to be factually undisputed that the wells subject to the petitioners' royalty interests produce "wet gas," which is saturated with liquid hydrocarbons and water. In some circumstances Antero does not process the wet gas; rather, it is sold at or near the wellhead or delivered into a gathering system where it is sold upon entry into an interstate transmission line. Otherwise, Antero delivers the wet gas (comingled with gas from other wells) to a processing plant in Doddridge County, West Virginia, where the heavier liquid hydrocarbon byproducts,

---

[3] *See* discussion *infra.*

4

referred to as the "Y-Grade mixture," are separated from the "residue gas." The residue gas is then sold either at the tailgate of the processing plant, at local sales locations, or at distant locations such as Chicago, Illinois, Detroit, Michigan, and the Gulf Coast. The residue gas commands different prices in different sales locations, but the sales result in different transportation costs. The Y-Grade mixture is transported to another processing plant some distance away where it is fractionated into the NGLs, specifically, ethane, butane, isobutane, propane, and natural gas. The NGLs are then sold either at the tailgate of the fractionation plant or transported to more distant markets.

Following extensive litigation in the district court – the case was filed more than seven years ago, the appendix record contains 7,340 pages of information, and at one point, the matter was stayed for approximately eighteen months to await what Antero anticipated would be a dispositive decision by the United States Court of Appeals for the Fourth Circuit[4] − the district court certified the two questions set forth above. By Order dated May 15, 2024, we accepted the certified questions and set this matter for oral argument. As noted *supra*, on November 14, 2024, we issued an opinion answering the certified questions; thereafter, on December 31, 2024, we granted Antero's petition for rehearing, established a new scheduling order, and set the matter for reargument.

---

[4] *See Corder v. Antero Res. Corp.*, 57 F.4th 384 (4th Cir. 2023), discussed *infra* at length.

5

## II. Standard of Review

It is well established that "'"[a] *de novo* standard is applied by this court in addressing the legal issues presented by a certified question[] from a federal district or appellate court." Syl. Pt. 1, *Light v. Allstate Ins. Co.,* 203 W.Va. 27, 506 S.E.2d 64 (1998).' Syllabus Point 2, *Aikens v. Debow,* 208 W.Va. 486, 541 S.E.2d 576 (2000)." Syl. Pt. 1, *Harper v. Jackson Hewitt, Inc.*, 227 W. Va. 142, 706 S.E.2d 63 (2010). Our resolution of the certified questions before us will be guided by this standard.

## III. Discussion

### A. "First available market" or "Point of Sale"

Antero acknowledges this Court's longstanding precedent governing a producer/lessee's right to deduct a proportionate share of postproduction costs when calculating an owner/lessor's royalties: "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." *Wellman*, 210 W. Va. at 202, 557 S.E.2d at 256, Syl. Pt. 4; *see also Estate of Tawney*, 219 W. Va. at 267, 63 S.E.2d at 23, Syl. Pt. 1. Nonetheless, Antero contends that this Court's recent pronouncement in *SWN Production Co., LLC v. Kellam*, 247 W. Va. 78, 875 S.E.2d 216 (2022), that syllabus points four and five[5] of *Wellman*

---

[5] Syllabus point five of *Wellman* provides:

"firmly cemented West Virginia as a 'marketable product rule' state, meaning that the lessee bears all postproduction costs incurred until the product is *first rendered marketable*, unless otherwise indicated in the subject lease[,]"[6] made clear that the words "transporting the product to the point of sale" in *Wellman* and *Estate of Tawney* actually meant "transporting the product to the point where it is first rendered marketable," i.e., to the "first available market."

We disagree. First, we note that notwithstanding the existence of a single sentence in *Kellam* that arguably supports its position, neither that sentence, nor any of the inferences Antero seeks to draw from it, are set forth in a syllabus point in the opinion. Clearly, because adoption of a "first available market" theory would have represented a sea change in the law as it had been understood for more than two decades, the Court in *Kellam* would have been constitutionally required to prepare a syllabus point[7] to announce

---

> If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

210 W. Va. at 202, 557 S.E.2d at 256, Syl. Pt. 5.

[6] *Kellam*, 247 W. Va. at 83, 875 S.E.2d at 221 (emphasis added).
[7] Article VIII, section 4 of the West Virginia Constitution provides, in relevant part, that "it shall be the duty of the court to prepare a syllabus of all points adjudicated in each

the modification or overruling of *Wellman* and its progeny if indeed that was our intent –

which it was not.

What *is* set forth in syllabus point three of *Kellam* is a reaffirmation of the

*Wellman* "point of sale" rule, without change. *See Kellam*, 247 W. Va. at 80, 875 S.E.2d at

218, Syl. Pt. 3 (quoting *Wellman*, 210 W. Va. at 202, 557 S.E.2d at 256, Syl. Pt. 4).

Undeterred by this fact, Antero contends that because a syllabus point "is not intended to

be an exhaustive recitation of every item decided in the case, and must be read in light of

the opinion as a whole[,]" *McKinley*, 234 W. Va. at 149, 764 S.E.2d at 309, the words

"transporting the product to the point of sale" actually mean "transporting the product to

the point where it is first rendered marketable" because the point of sale in both *Wellman*

and *Estate of Tawney* was in fact the first available market, i.e., a location in the local basin.

Again, we disagree. At the outset, we note that it is not entirely clear from a

close reading of those cases that Antero's flat assertion of fact is correct. In *Wellman*, the

sheer amount of postproduction costs sought to be deducted by the producer suggests that

the product may not have been sold at or near the wellhead,[8] where one would expect such

case in which an opinion is written and in which a majority of the justices thereof concurred[.]" *See* Syl. Pt. 1, *State v. McKinley*, 234 W. Va. 143, 764 S.E.2d 303 (2014) ("Signed opinions containing original syllabus points have the highest precedential value because *the Court uses original syllabus points to announce new points of law* or to change established patterns of practice by the Court.") (emphasis added).

[8] It was undisputed that the lessee sold the gas for $2.22 per thousand cubic feet and claimed $1.35 per thousand cubic feet in postproduction costs – ultimately reducing the

costs to be minimal or nonexistent. In *Estate of Tawney*, "the arguments presented by [the lessee] . . . essentially posited that gas was not sold at the wellhead, but to a supplier downstream[.]" *Kellam*, 247 W. Va. at 84, 875 S.E.2d at 222 (discussing *Estate of Tawney*). Further, there is no indication in either *Wellman* or *Estate of Tawney* that the Court's holdings were geographically limited in any way, and indeed, post-*Estate of Tawney* developments in the area of oil and gas royalties strongly suggest otherwise.[9] As detailed *supra*, in *Kellam*, where we reaffirmed the validity of our "point of sale" language in syllabus point three, there was no indication that oil and gas from the royalty owners' wells was sold at the first available market. Additionally, Antero's analysis omits any mention of the fact that in 2018 – more than a decade after *Estate of Tawney* – the West Virginia Legislature unambiguously adopted our "point of sale" jurisprudence when it amended West Virginia Code section 22-6-8(e) to provide that, with respect to flat-rate lease provisions subject to the statute,[10] the provider must agree to pay a royalty "not less than

---

lessors' one-eighth royalty interests by almost two-thirds. *See Wellman*, 210 W. Va. at 204, 557 S.E.2d at 258.

[9] The only post-*Estate of Tawney* case in which this Court evidenced some support for the industry's attacks on *Wellman* and *Estate of Tawney* was *Leggett v. EQT Production Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017), where a majority of the Court harshly criticized both *Wellman* and *Estate of Tawney*, going so far as to characterize those opinions as reflecting the Court's "complete misunderstanding of the [oil and gas] industry" and its analyses as "nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor." *Id.* at 277, 800 S.E.2d at 863. We later described *Leggett's* criticism of *Wellman* and *Estate of Tawney* as a "somewhat indulgent frolic" which was "mere obiter dicta and of no authoritative value to this Court today." *Kellam*, 247 W. Va. at 87-88, 875 S.E.2d at 225-26.

[10] Although flat rate lease provisions by their express terms entitle mineral owner/lessors only to a yearly sum certain, per well, per year – i.e., a payment in the nature

one eighth of the gross proceeds, free from any deductions for post-production expenses, received at the *first point of sale to an unaffiliated third-party purchaser in an arm's length transaction* for the oil or gas so extracted, produced or marketed." *Id.* (emphasis added).

We also find it significant that the words "transporting the product to the point of sale" in *Wellman* and *Estate of Tawney* do not stand alone; the language in those cases, as well as in *Kellam*, is "producing, *marketing*, and transporting the product to the point of sale." In this regard, we have held that the "duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market." *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264; *see also Kellam*, 247 W. Va. at 87 n.3, 875 S.E.2d at 225 n.3 ("the implied duty to market means a duty to get the product to the place of sale in marketable form.") (citing *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882 (Okla. 1992)). Thus, the word "marketing" in the duty first enunciated in *Wellman*, and thereafter consistently reaffirmed for the past twenty-four years, would be entirely superfluous if we were to adopt Antero's argument that its only duty is to produce and then transport the oil or gas to the point where it is "first rendered marketable" or to the "first available market."

---

of a rent rather than a royalty – subsection (e) of the statute prohibited the issuance of permits for new drilling or for the reworking of existing wells unless the producer/lessee filed an affidavit certifying that it would pay royalties to the owner/lessor as set forth *infra*. *See* W. Va. Code § 22-6-8(e).

This brings us to the real heart of Antero's argument, which is that whether by interpreting syllabus point four of *Wellman*, modifying it, or overruling it, this Court should adopt the "marketable product rule" as set forth in *Garman v. Conoco*, 886 P.2d 652 (Colo. 1994): that there exists a presumption that lessees bear all postproduction costs until they have "made the gas marketable in the first place." *Id*. at 658, 662. In this regard, Antero notes that the *Wellman* Court relied on *Garman* in its analysis of a related issue, the lessee's implied duty to market, but failed to follow *Garman's* ultimate conclusion that "[u]pon obtaining a marketable product, any additional costs incurred to enhance the value of the marketable gas, such as [transportation costs and costs to process gas into its components], may be charged against nonworking interest owners." *Id*. at 661; *see also Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 800 (Kan. 1995) ("the Colorado Supreme Court held as we believe the law in Kansas to be: Once a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners."); *Mittelstaedt v. Santa Fe Mins., Inc.*, 954 P.2d 1203, 1207 (Okla. 1998) (citing both *Garman* and *Sternberger* with approval for the proposition that "[o]nce a marketable product is obtained, reasonable costs incurred to transport or enhance the value of the marketable gas may be charged against nonworking interest owners."). Because all three of the cited cases were relied upon in *Wellman*, Antero concludes that *Wellman* "cannot be read" to hold that lessees have a duty to market gas beyond the first available market to a later point of sale, or to incur all costs associated with moving the product from a first available market to a final point of sale.

11

Not only can *Wellman* be read to hold that "the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale[,]" as Antero acknowledges, that is exactly what it *did* hold.[11] *Wellman*, 210 W. Va. at 202, 557 S.E.2d at 256, Syl. Pt. 4. This holding was reaffirmed by the Court in *Estate of Tawney* and *Kellam*, then reaffirmed by the Legislature – resoundingly[12] – after *Leggett* suggested that our precedents might be on the judicial chopping block. Thus, it is clear that our cases are based on a solid foundation of established practice and established legal principles in this State.[13]

---

[11] Even the United States Circuit Court for the Fourth Circuit rejected Antero's "first point of marketability" argument in *Corder*: "[W]e cannot ignore the *express 'point of sale' language* in the syllabus points in *Wellman*, *Tawney*, and *Kellam*. Because the West Virginia Supreme Court has not adopted a contrary rule, we conclude that the *Tawney* requirements apply through point of sale." *Corder*, 57 F.4th at 297 (emphasis added).

[12] The Legislature's amendment of West Virginia Code section 22-6-8(e), which specifically targeted the anomaly of *Leggett* in our jurisprudence, was consistent with its duty to determine the policy of this State with respect to the interests of the oil and gas industry *vis a vis* the interests of citizens having royalty rights in the oil and gas produced.

[13] As we stated in *Kellam*,

> *Wellman* and *Tawney* are consistent with decades of oil and gas jurisprudence in this State, as well as general principles of contract which undergird the formation of oil and gas leases— including the use of implied covenants when a lease is silent on an issue. While litigation has arisen under those opinions, that is not indicative of instability or 'chaos' but is the 'unavoidable consequence' of any opinion of this Court. *Leggett*, 239 W. Va. at 284, 800 S.E.2d at 870 (Workman, J., concurring). In actuality, it is far more likely in our opinion that overruling *Tawney* and *Wellman* would *result* in instability and uncertainty, particularly for the thousands of leases that have

12

A further reason for our decision today to reaffirm the validity of *Wellman* and *Estate of Tawney*, and specifically the "point of sale" rule, is the likelihood that a "first marketable product rule" is likely to generate endless litigation because the question of whether and when gas is marketable is a complex question of fact. *See Leggett*, 239 W. Va. at 273 n.13, 800 S.E.2d at 859 n.13 (citing *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 906 (Colo. 2001) ("[g]as is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace. The determination of whether gas is marketable is a question of fact, to be resolved by a fact finder.").

Although we acknowledge that other states, including Kansas, Colorado, and Oklahoma as discussed *supra*, have taken an opposing view with respect to this issue, we are not inclined to upset our well-grounded precedents, not to mention decades of settled expectations based on those precedents, simply for the comfort of acceding to the majority view, immune from the criticism that may result from staking out a minority position. In this regard, we reject Antero's suggestion that alignment with the views of other jurisdictions is a goal in and of itself. When this Court has overruled its own precedent and

been executed in the years since those opinions were published.

*Kellam*, 247 W. Va. at 89, 875 S.E.2d at 227.

13

thereby brought itself into alignment with a contrary majority view, it is because we have determined that the majority view is a "better and more legally sound approach." *E.g., State v. Sutherland*, 231 W. Va. 410, 418, 745 S.E.2d 448, 456 (2013). Here, in contrast, we conclude that the majority position, although cogent, simply does not align with West Virginia's historical practice, our long-established law, and the actions of our Legislature. In this regard, the rule of law is a foundational principle underlying our democracy, a principle that allows individuals and entities to order their affairs according to well-defined rules. Whatever the relative merits of other jurisdictions' differing approaches to the issue presented in this case, this Court's approach must be based upon established West Virginia law,[14] West Virginia history and practice, the settled expectations of West Virginia citizens, and clear expressions of legislative intent. That is precisely what we did in *Wellman*, in *Estate of Tawney*, and in *Kellam*, and we decline to open the door to the chaos that may well ensue if we abruptly – and without any compelling reason – change decades of law upon which thousands of people have relied in ordering their economic affairs.

We appreciate the force of Antero's arguments having to do with the possible economic repercussions of our "point of sale" rule; for example, Antero posits that producers may be inclined to focus their operations in other markets where they are not

---

[14] As United States District Judge John Preston Bailey recently wrote, "under *longstanding West Virginia law*, when paying oil and gas royalties, the default rule is that '(1) lessees may not deduct postproduction costs unless the lease agreement explicitly permits such deductions; and '(2) where there is such a provision, only reasonable and actually incurred expenses may be deducted.'" *Hopper v. Jay-Bee Oil & Gas, Inc.*, No. 5:20-CV-101, 2023 WL 3696333, at *4 (N.D.W. Va. Apr. 11, 2023) (emphasis added).

required to absorb all postproduction costs, with the result that mineral owners here may suffer from a decrease in production from West Virginia wells. These are valid points, and reasonable minds could differ if the object of the exercise were to pick winners and losers based on social and economic policy concerns.[15] However, it is not within this Court's remit to decide cases based on policy concerns; that is a task constitutionally delegated to the West Virginia Legislature.[16] *See, e.g., MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, *722*, 715 S.E.2d 405, 420 (2011) ("it is the province of the legislature to determine socially and economically desirable policy") (citation omitted).

For the reasons stated, we decline to interpret, modify, or overrule *Wellman* and/or *Estate of Tawney* in whole or in part. Accordingly, we answer the district court's first certified question in the negative and hold that except as may be specifically provided by the parties' agreement, where an oil and gas lease contains an express or implied duty to market, the requirements of *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 219 W.

---

[15] This is precisely what the *Leggett* majority did, albeit in dicta, complaining that our "point of sale" rule "results in an even bigger *windfall* for lessors than the 'marketable product' approach" because the lessor "will receive a royalty valued upon the gas in its processed state at the point of sale after the gas has had value added to it solely at the lessee's expense." *Leggett*, 239 W. Va. at 276-77, 800 S.E.2d at 862-63 (emphasis added) (citation omitted).

[16] Article V, section 1 of the West Virginia Constitution provides in relevant part that "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]"

Va. 266, 633 S.E.2d 22 (2006), extend to the point of sale, not just to the point of marketability or to the first available market.

**B. Does the Marketable Product Rule Extend to Royalties on NGLs?**

We turn now to the district court's second certified question, which is actually two questions: (1) does the first marketable product rule extend beyond gas to require a lessee to pay royalties on NGLs, and (2) if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale? To begin our discussion, we reiterate that this Court has not adopted a "first marketable product rule" as defined in the Kansas, Colorado, and Oklahoma cases discussed *supra*. Rather, we confirmed in *Kellam* that West Virginia is a "marketable product rule state," meaning that unless the lease provides otherwise, royalties may not be calculated based on the value of the oil and gas at a stage where it has not yet been marketed, i.e., sold to a third-party purchaser in an arms-length transaction. *See Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264 ("the duty to market embraces the responsibility to get the oil or gas in marketable condition *and actually transport it to market*.") (emphasis added)); *see also* W. Va. Code § 22-6-8(e) (requiring that flat-rate lease royalties be "not less than one eighth of the gross proceeds, free from any deductions for post-production expenses, received at the *first point of sale to an unaffiliated third-party purchaser in an arm's length transaction* for the oil or gas so extracted, produced or marketed." ).

16

Although the distinction between the "first marketable product rule," the term used by the district court in the certified question, and the "marketable product rule," as explicated in our precedents, is key to our resolution of the second prong of the certified question, *see infra*, it is irrelevant to the first prong because Antero specifically acknowledges that *"[t]here is no dispute that if the lessee sells the by-products at a profit, it must share royalties with the lessor*." (Emphasis added). Thus, we answer the first prong of the second certified question in the affirmative and hold that except as may be specifically provided by the parties' agreement, royalties are payable to the mineral owner/lessor not only from the producer/lessee's sale of wet gas and residue gas but also from the lessee's sale of any byproducts of the wet gas such as natural gas liquids.

## C.     Whether Deduction for Postproduction Costs on the sale of NGLs is Permissible.

Having held that the marketable product rule extends beyond gas to require a lessee to pay royalties on the sale of NGLs, we now turn to the second prong of the certified question: do the lessors share in the cost of processing, marketing, and transporting the NGLs to sale; and if not, should they?[17] Antero contends, in accordance with its earlier argument that *Kellam* implicitly modified the "point of sale" language in *Wellman* and

---

[17] Although the district court's certified question does not differentiate between wet gas and residue gas, Antero's arguments logically extend to both residue gas and NGLs, because both result from processing and therefore fall within the rubric of "making the [wet] gas marketable."

17

*Estate of Tawney* and by doing so transformed West Virginia into a "first marketable product" jurisdiction, that the implied duty to market ends when a producer renders the wet gas marketable at the processing plant, and that any costs incurred thereafter for transporting the residue gas to market and fractionating and transporting the NGLs to market should be shared proportionately by the lessor and the lessee. Because we have declined to adopt the "first marketable product" rule, we must decide whether the "marketable product rule," which *Wellman* defined as the duty to "explor[e] for, produc[e], market[], and transport[] the product to the point of sale[,]"[18] allows Antero to deduct for its postprocessing costs, specifically, transporting residue gas[19] to market, fractionating wet gas, then transporting the resultant NGLs to market.

Antero correctly points out that because the gas produced in *Wellman* and *Estate of Tawney* was not processed before its sale, those cases are not directly on point. We agree; however, we find that the underlying rationale of those cases applies with equal force to the question before us. In this case, just as in *Wellman* and *Estate of Tawney*, we are guided by basic contract principles, including "'[t]he general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.' Syllabus Point 1, *Martin v. Consolidated Coal & Oil Corp.,*

---

[18] *Wellman*, 210 W. Va. at 202, 557 S.E.2d at 256, Syl. Pt. 4, in part.

[19] Antero represents that residue gas is most often transported to a point of sale which is at an interconnect to a long distance pipeline.

18

101 W.Va. 721, 133 S.E. 626 (1926)." *Est. of Tawney*, 219 W. Va. at 267, 633 S.E.2d at 23, Syl. Pt. 7. In this regard,

> "'[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent.' Syllabus Point 1, *Cotiga Development Co. v. United Fuel Gas Co.,* 147 W.Va. 484, 128 S.E.2d 626 (1962). However, when a contract is ambiguous, it is subject to construction. This Court has said that '[t]he term "ambiguity" is defined as language 'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning.' *Payne v. Weston,* 195 W.Va. 502, 507, 466 S.E.2d 161, 166 (1995), *quoting* Syllabus Point 1, in part, *Shamblin v. Nationwide Mut. Ins. Co.,* 175 W.Va. 337, 332 S.E.2d 639 (1985)."

*Est. of Tawney*, 219 W. Va. at 272, 633 S.E.2d at 28. Further, "[o]ur interpretive rules of construction regarding ambiguity require that, under such circumstances, we construe the language against the drafter, the party who had the authority and opportunity to bring about clarity." *Payne v. Weston*, 195 W. Va. 502, 509, 466 S.E.2d 161, 168 (1995) (footnote omitted). Finally, "'[t]he question as to whether a contract is ambiguous is a question of law to be determined by the court.' Syllabus Point 1, in part, *Berkeley County Pub. Serv. Dist. v. Vitro Corp. of Am.,* 152 W.Va. 252, 162 S.E.2d 189 (1968)." *Est. of Tawney*, 219 W. Va. at 267, 633 S.E.2d at 23, Syl. Pt. 5.

Mindful of these principles, we examine the leases in question in order to address Antero's argument that the *Wellman/Estate of Tawney* duty to market should

19

extend only to what Antero terms "gas itself," not to its byproducts, i.e., residue gas and NGL's. We begin by noting that the word byproducts is somewhat misleading in this context, as the word is most often used to denote "something that is produced as a result of making something else."[20] In the case at bar, nothing is produced or made at the processing facility; rather, the "gas itself" is simply broken down into its component parts. The heavier liquid hydrocarbons are separated from the residue gas, which is then marketed, and the Y-Grade mixture of liquid hydrocarbons is transported to another processing facility where it is fractionated into NGLs, which are then marketed. Further, we reject Antero's argument that processing and/or fractionating wet gas "transforms" and "enhances" it, thus making it only equitable to require lessors to share in the costs of making and transporting what is now a more valuable product even in the absence of specific language in the lease allowing for the deduction of these post-production costs. *See The Grissoms, LLC v. Antero Res. Corp.*, 133 F.4th 605, 611-12 (6th Cir. 2025) (rejecting Antero's argument that "value-enhancing costs" should be deductible because this would, in effect, "make all costs deductible after Antero separates the oil, gas, water, and sand. In substance and form, that would be an 'at the wellhead' royalty, and no one claims the parties entered such an all-or-nothing-at-all agreement.").

With the foregoing understanding, the dispositive question before us is whether the petitioners' leases contain clear, unambiguous language indicating the parties'

---

[20]*Byproduct*, Cambridge Dictionary Online, https://dictionary.cambridge.org./byproduct (last visited Oct. 21, 2024).

20

agreement that royalties will be paid on the net sale price of residue gas and/or NGLs , i.e., the mineral owners' proportionate share of the sale price less their proportionate share of the costs incurred by the producer after the point at which the wet gas was rendered marketable.[21] In this regard, Antero contends that the residue gas became marketable at the latest after it was separated from the heavier liquid hydrocarbons in the wet gas, and the NGLs became marketable at the latest after they were fractionated from the wet gas.[22] Thus, we now review the language of the leases to determine whether they evidence the parties' agreement that royalties would be determined by whether the gas was sold in its original form ("gas itself") or sold after it had been processed and/or fractionated into its component parts, residue gas and NGLs. *See Est. of Tawney*, 219 W. Va. at 267, 633 S.E.2d at 23, Syl. Pt. 10 ("Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.") Even a

---

[21] This was termed a "net-back" or "work-back" methodology for calculating royalties in *Leggett*, 239 W. Va. at 267-68, 800 S.E.2d at 853-54, although in that case the producers argued that they were entitled to use the methodology to duplicate the price of the gas at the wellhead. Here, Antero seeks to duplicate the price at the point of first marketability, i.e., the processing plant.

[22] As noted *supra*, when gas becomes marketable is a question of fact, and Antero does not concede that the gas from the petitioners' wells was not marketable prior to being processed.

21

cursory review of the leases at issue in this case leads to the conclusion that they fail the *Est. of Tawney* test. *See id.*

In the Mutschelknaus leases, the lessors' royalty is stated to be a proportionate one-eighth share of the "gas . . . which is marketed and used off the premises." Taken literally, what this language suggests is that royalties are payable only so long as the gas is not sold at the wellhead, which would be an absurd result. Further, nothing in the language suggests that the word "gas" means only unprocessed gas, i.e., what Antero terms "gas itself," because that would lead to another absurd result: that once gas is processed, no further royalties are payable either at the point of marketability or at the point of sale. Even Antero does not contend that the lease may be construed in this way, as it concedes that royalties are payable on NGLs. *See* text *supra.* And critically, the leases contain no language, express or implied, that the lessor will be responsible for some portion of postproduction costs once the "gas itself" is processed. In summary, the language of the Mutschelknaus leases is ambiguous with respect to whether, when, and how royalties are payable to the lessor, and completely silent with respect to whether, when, and how postproduction costs may be deducted from the royalties.

In the Matthey lease, the lessors' royalty is stated to be a proportionate one-eighth share of the "gross proceeds received from the sale of the same at the prevailing price for gas sold at the well, for all native gas saved and marketed from the said premises." Taken literally, what this language suggests is that royalties are payable only so long as the

gas is sold at the wellhead – the exact opposite of the Mutschelknaus leases – leading to yet another absurd result: that once gas is transported to and marketed from any point beyond the wellhead, no further royalties are payable. Additionally, as was the case with the Mutschelknaus leases, the Matthey lease contains no language, express or implied, that the lessor will be responsible for some portion of postproduction costs; indeed, postproduction costs would not be implicated under this lease since the gas from the lessor's wells would have been sold from the wellhead under a literal application of the language. Finally, as was the case with the Mutschelknaus leases, the language of the Matthey lease is ambiguous with respect to whether, when, and how royalties are payable to the lessor, and completely silent with respect to whether, when, and how postproduction costs may be deducted from the royalties.

Our conclusion that both the Mutchelknaus and Matthey leases fail the *Estate of Tawney* test is supported by the undisputed fact that once gas is produced from lessors' wells, it is the producer/lessee, not the lessors, who makes all of the critical decisions as to whether to market the gas at the wellhead or downstream; whether and where to process the gas in order to separate the residue gas and thereafter fractionate the remaining wet gas into NGLs; and where to sell the residue gas and the NGLs. Obviously, these decisions are based on the producer's desire to maximize its profits, which is its absolute right and the ultimate goal of any business enterprise. However, where the effect of maximizing the producers' profits is to minimize the owner/lessors' royalties, all on the basis of decisions in which the lessors have no input, fundamental fairness requires that the lessors be on

23

*notice* that their royalties will vary depending on when, where, and how the producers get the gas to market. This is the underlying rationale of *Wellman* and *Estate of Tawney,* which require that such notice be set forth in clear, unambiguous language in the leases which govern the parties' dealings.

For the reasons stated, we answer the second prong of the second certified question in the negative and hold that absent express language in a gas lease sufficient to satisfy the requirements set forth in syllabus point ten of *Estate of Tawney v. Columbia Natural Resources, L.L.C.,* 219 W. Va. 266, 633 S.E.2d 22 (2006), a producer/lessee may not deduct from a mineral owner/lessor's royalties a proportionate share of the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale.

## IV.  Conclusion

Based upon our analysis, we answer the certified questions as follows:

Question No. 1:  Do the requirements of *Wellman v. Energy Resources, Inc.,* [210 W. Va. 200, 557 S.E.2d 254 (2001)], and *Estate of Tawney v. Columbia Natural Resources,* [219 W. Va. 266, 633 S.E.2d 22 (2006)], extend only to the "first available market" as opposed to the "point of sale" when the duty to market is implicated?

Answer: No.

24

Question No. 2: Does the marketable product rule[23] extend beyond gas to require a lessee to pay royalties on natural gas liquids ("NGLs"), and if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale?

Answer: As to the first part of the question, yes; *Wellman's* marketable product rule extends beyond gas to require a lessee to pay royalties on NGLs. As to the second part of the question, no; absent express language in the lease to the contrary, the lessors do not share in the cost of processing, manufacturing, and transporting residue gas and NGLs to sale.

Certified Questions Answered.

---

[23] As set forth *supra*, we have declined to adopt the "first marketable product rule" and thus modify the district court's question accordingly.